**GREATER HOUSTON CHAPTER OF the AMERICAN CIVIL LIBERTIES UNION, Robert Binford, Douglas Griffith and Lillian Ducharme**

v.

**Robert ECKELS, Individually and in his Official Capacity as Member of the Commissioners Court, Harris County, Texas.**

Civ. A. No. H–82–0035.

United States District Court, S.D. Texas, Houston Division.

May 22, 1984.

Stefan Presser, American Civil Liberties Union, and Joellen Snow, Houston, Tex., for plaintiffs.

T. Gerald Treece, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

I. *The Procedural History of the Case and the Court's Ruling*

The construction and maintenance of three Latin-style crosses and a Star of David in a public park by an elected public official resurrects topical and sensitive issues involving the Establishment Clause of the First Amendment of the United States Constitution. Claiming that the defendant's sponsorship and endorsement of these religious symbols constitute an unconstitutional governmental advancement of religion, plaintiffs instituted this action seeking, among other things, removal of the symbols from the park. Quickly stated, defendant's most recent response to plaintiffs' allegations is that the symbols are part of a planned war memorial which serves the secular (non-religious) purpose of honoring the county's war dead and, as

a result, his actions withstand constitutional scrutiny regardless of which of the multiple legal tests articulated by the Supreme Court this Court chooses to apply. Defendant asserts further as an affirmative defense that a court-ordered removal of the religious symbols would itself result in the unconstitutional establishment of the religion of Humanism.

This cause was tried to the Court without a jury on August 31 and September 1, 1983. At the conclusion of the evidence the Court requested additional briefing by the parties and took the case under advisement. Subsequently, the Court, cognizant that the Supreme Court was soon to decide a case involving related legal issues which hopefully would resolve some of the deep-rooted uncertainty plaguing this area of the law, informed the parties that it would defer a ruling on this case until the Supreme Court rendered its decision in *Lynch v. Donnelly,* — U.S. —, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). The Supreme Court issued its ruling in *Lynch v. Donnelly* on March 5, 1984. To further ensure that the issues raised by this lawsuit receive the plenary attention they so obviously deserve, the Court then requested additional briefing regarding the effect, if any, which *Lynch v. Donnelly* has on this case. The Court, based upon an extensive review of both the trial record and the applicable constitutional commandments which this Court is duty bound to follow, hereby enters its Findings of Fact and Conclusions of Law pursuant to Rule 52(a), Fed.R.Civ.P. which reflect the Court's opinion that the defendant's legal arguments are misplaced and that the religious symbols must be removed from the county park. However, in reaching this result, the Court cannot emphasize enough that its decision is based solely upon its interpretation of the current state of the applicable constitutional case law and not upon any personal religious predilections. Further, this decision does not, of course, affect the ability of private individuals to erect religious symbols on non-public property. With this introduction in mind, the Court turns now to a consideration of the largely uncontested facts of this case.

## II. *The Uncontested Facts*

### A. *The Park, the County and the Commissioner*

Bear Creek Park, the location of the religious symbols at issue, is situated on a 2700 acre tract of land in western Harris County, Texas. The park land is actually owned by the United States; however, the United States, through the Army Corps of Engineers, leases the land to Harris County for use as a multi-purpose public park. Harris County is divided geographically into four separate precincts. Bear Creek Park is located in Precinct Three, the largest of the county's four precincts. Robert Eckels ("Commissioner Eckels") is the elected County Commissioner in charge of Precinct Three. (Testimony of Eckels; Admissions of Fact).

Commissioner Eckels' official duties can be divided into two broad areas. First, he has responsibility for the construction and maintenance of all public works such as roads, bridges and parks located within the geographical boundaries of Precinct Three. As stated, Bear Creek Park is within Commissioner Eckels' domain. Second, Commissioner Eckels along with the other county commissioners and the county judge form an administrative body identified as the Harris County Commissioners Court which is charged with the task of formulating and overseeing the county budget. The Commissioners Court is also responsible for approving all county expenditures. (Testimony of Eckels; Admissions of Fact).

Revenue for county expenditures such as park improvements and maintenance is derived from a county wide *ad valorem* tax levied on all Harris County residents. In other words, revenue collected in the form of *ad valorem* taxes from a resident in one precinct may be spent on county projects in any one of the four precincts within Harris County. (Testimony of Eckels; Admissions of Fact).

## B. *The Decision to Erect the Symbols*

Following a series of townhall meetings in 1980, Commissioner Eckels, at the insistence of some of his constituents, decided that a portion of Bear Creek Park should be devoted exclusively for use as a passive area for personal reflection and meditation. Additionally, his constituents suggested that the placement of crosses in this area would be conducive to the meditative process and Commissioner Eckels concurred. In an effort to carry out the wishes of his constituents, Commissioner Eckels personally selected a tract of land at the intersection of Golbow Road and Addicks-Fairbanks Road to be used for these meditative purposes. (Defendant's Exhibit No. 6; Plaintiffs' First Amended Complaint ¶ 10). The particular site was chosen by Commissioner Eckels because it could be easily supervised by county personnel who would ensure that the meditation area would not be used for non-passive activities such as sporting events and cook-outs. In addition, the symbols were located directly across from the park's administrative office on Golbow Road. The site is also adjacent to a combination duck pond/aviary/zoo, popular park attractions that are the homes of a number of birds and animals that have been donated to the county.

After the site was selected, Commissioner Eckels instructed the park superintendent, a county employee, to construct three Latin-style crosses on the meditation site. County employees subsequently erected the three crosses in a row on top of a grassy knoll using some of the county's surplus or salvage building materials. The crosses were identical except for size: the middle cross is taller than the outer two crosses which are of equal height. In the beginning, the crosses were the sole religious symbols that Commissioner Eckels

deemed appropriate for the meditation area. (Testimony of Eckels; Admissions of Fact; Plaintiffs' Exhibits Nos. 1–4).

At some point after the construction of the crosses, Commissioner Eckels was approached by an unspecified number of his Jewish constituents regarding the possibility of the erection of a Star of David in the meditation area. To satisfy these requests, Commissioner Eckels ordered the construction of the Star of David in the same general vicinity as the crosses. Like the three crosses, the Star of David was built with salvage building material and county labor. The Star of David was constructed on top of a separate grassy knoll just a few yards from the crosses. (Testimony of Eckels; Admissions of Fact; Plaintiffs' Exhibits Nos. 1, 2, 4).

On May 18, 1981, a representative of the Greater Houston Chapter of the American Civil Liberties Union ("ACLU") wrote the Harris County Attorney to express the ACLU's concern that county funds had been expended to construct the religious symbols. On June 4, 1981, Stefan Presser, staff counsel for the ACLU, addressed the Harris County Commissioners Court concerning the legal ramifications of Commissioner Eckels' erection of the religious symbols. Presser requested that Commissioner Eckels remove the symbols and reimburse the county for the funds expended. Commissioner Eckels agreed with Mr. Presser that county funds should not have been used to construct the religious symbols. Consequently, he tendered his personal check for $114.96 to reimburse the county for the costs of construction of the symbols. However, the Commissioners Court took no action on Presser's request to dismantle the symbols.[1] Instead, the matter was referred to the County Attorney for his consideration. (Testimony of

---

1. While the Commissioners Court took no action on Mr. Presser's request to dismantle the symbols, at least one member of the Commissioners Court was aware of the possible legal ramifications of Commissioner Eckels' actions. Specifically, Commissioner Tom Bass stated:

I think that we are flipping sides on this, but I think the courts have probably ruled a num-

ber of times along the lines he [Mr. Presser] is talking about and that is a permanent religious fixture in a public facility. I think that we are asking for trouble on a legal point of view.

(Plaintiffs' Exhibit No. 6 at p. 45).

Eckels; Admission of Fact; Plaintiffs' Exhibit No. 6).

On January 6, 1982, with the symbols still intact in the park, Jane Doe and John Roe, Harris County citizens and taxpayers, filed this suit against Commissioner Eckels in both his individual and official capacities seeking removal of the religious symbols from the park.[2] Commissioner Eckels answered the lawsuit on February 19, 1982, by denying all of plaintiffs' material allegations. No mention was made at that time of the planned use of the meditation site for a war memorial. This is especially noteworthy since on February 18, 1982, just five weeks after the filing of the lawsuit, Commissioner Eckels had requested and received the Commissioners Court's blessing to dedicate certain county park areas as war memorial sites.[3]

Commissioner Eckels also alleges as an affirmative defense that the establishment of the religion of Humanism will result if the Court rules against him. In capsule form, his affirmative defense is that by removing the symbols from the park the Court is expressly aiding the religion of Humanism, which purportedly seeks the removal of all organized religions from society.

Today, the plaintiffs are the Greater Houston Chapter of the American Civil Liberties Union ("ACLU"), Robert Binford, Douglas Griffith and Lillian Ducharme.[4] Lillian Ducharme is an ACLU member and was a Harris County resident until the fall of 1982. Douglas Griffith is a taxpaying Harris County resident and an ACLU member. Robert Binford is a Vietnam War Veteran and an ACLU member.

### III. *The Trial*

The Court heard testimony from several witnesses and the parties during this two day trial. At the risk of some evidentiary overlap, the Court finds it necessary to summarize that testimony witness by witness in order to fully underscore the facts and religious shades of difference that the Court will later employ in performing its legal analysis.

### A. *Plaintiffs' Case*

Plaintiff Ducharme lived approximately one-half mile from the park at the time the symbols were erected. Mrs. Ducharme, as the mother of two young daughters, often used the park facilities such as the playground, picnic areas and zoo area. She first learned of the symbols' existence in a local newspaper. The first time that she actually saw the symbols was when she took her daughters to the zoo. As men-

---

**2.** At this juncture, the Court deems it appropriate to briefly trace the history of the party plaintiffs. Originally, John Roe, a.k.a. Rip Long, and Jane Doe brought this suit in pseudonym. Subsequently, the Court ordered plaintiffs to disclose their true identities. In response to the Court's order, both Rip Long and Jane Doe sought voluntary dismissals pursuant to Rule 41(a)(2), Fed.R.Civ.P. However, prior to Rip Long's dismissal, the plaintiff moved for joinder of the ACLU as a proper party plaintiff. The issue of the ACLU's associational standing was ruled upon and decided in favor of the ACLU. The ACLU was the sole plaintiff at the time of trial.

At the conclusion of the plaintiff's case in chief, plaintiff moved to add Robert Binford, Douglas Griffith and Lillian Ducharme, all ACLU members who testified at trial, as individual party plaintiffs. The Court, over the defendant's objections based largely on surprise and lack of standing, granted the motion which placed the case in its current posture. Finally, because the Court is confident that its prior rulings with regard to the issue of standing of the various

plaintiffs are amply supported by existing judicial precedent, *see, e.g., American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098 (11th Cir.1982) (denial of the beneficial use and enjoyment of a public park sufficient to confer standing to challenge governmental actions), and because the standing issue has been ventilated sufficiently in the past, the Court is of the opinion that it requires no further treatment.

**3.** At trial, Commissioner Eckels testified that the war memorial idea was presented to him in 1981 by Post 581 of the Veterans of Foreign Wars. See footnote 8, *infra.* In addition, in September of 1982, well after the filing of this lawsuit, he wrote at least one area minister seeking support in his attempts to return "to the values that America has deserted to her peril." (Plaintiffs' Exhibit No. 8). Again, no mention was made of using the symbols for part of a war memorial.

**4.** See footnote 2, *supra.*

tioned, the zoo is adjacent to the meditation site.

Mrs. Ducharme testified that as a Jew she felt terrified and threatened by the placement of the symbols in a public park. She briefly documented some of her unfavorable childhood experiences as a Jew and her strong desire to teach her children religious tolerance so that they would learn to respect all religious differences. She also testified that she wrote a letter to the editor of a neighborhood newspaper voicing her opposition to what she perceived as the county government endorsing some religions over others in violation of the Constitution. She stated that even though her family had moved to the Woodlands area in nearby Montgomery County, they still visit the Bear Creek area on occasion to see friends. However, she testified that her family could not use any of the park facilities so long as the symbols stood in the park. Finally, when asked about what her feelings would be if the symbols were part of a war memorial, she stated that she would have the same objection that she currently harbors.

Plaintiff Griffith, a father of three and resident of Precinct Three, testified that he learned of the existence of the symbols from a friend. He stated that while he had not personally been to the park since the erection of the symbols, he and his family will not visit or use the park while the religious symbols are in the park. He further stated that he has taught his children "evolution" and does not want to raise them with any religious affiliation. Consequently, he objects to the presence of the symbols because of their religious connotations. When questioned about the use of the four religious symbols as part of a proposed war memorial, he testified that he would oppose such a usage because he believed that such symbols belong in a cemetery and not a public park. Finally, Mr. Griffith suggested that the true reason the symbols are in the park is to aid religion and not for the allegedly secular purpose of honoring the war dead.

Plaintiff Binford, a decorated Vietnam War Veteran, testified primarily about the use of the existing symbols for the planned war memorial. When shown a sketch of the proposed Harris County war memorial, Mr. Binford, an atheist, expressed his disapproval of the inclusion of the existing religious symbols in the memorial. He unequivocally stated that he would not visit the war memorial if it contained those symbols. Finally, Mr. Binford testified that he was personally unaware of the existence of any religious symbols on the recently dedicated Vietnam War Memorial in Washington, D.C.

The plaintiffs also called several witnesses who testified concerning the religious ramifications of the symbols' presence in the park. The first such witness, Rabbi Saul Osadchey, testified at length about the history and evolution of the Star of David as a symbol of Judaism. He traced the origin of the Star of David from its first reference in the Koran, as the Shield of David, to the Middle Ages, when it was used in a non-religious context both as a printer's sign and to denote official Jewish documents, up until its modern day usage as a symbol representing Judaism. He stated that this public display of the Star of David reminded him of the Holocaust when it was used by Nazi Germany to denigrate Judaism. He further testified that this usage of the Star of David hurt his ability to educate children and demonstrated that the government is giving preference to one religion over another. He stated that the erection of the Star of David by a non-Jew had absolutely no religious significance.

Rabbi Osadchey also testified concerning his interpretation of the three crosses. To him the crosses represent the life, the birth, and the death of Jesus Christ. He considered the crosses to be unquestioned Christian symbols, and he viewed their erection along with that of the Star of David as erroneously conveying the idea that Christianity and Judaism are the only two religions in Houston. He was hesitant to use the park with the symbols present.

When Rabbi Osadchey was questioned about the use of the symbols in a war memorial, his opinion was unchanged. He stated that a Star of David is not a prerequisite to remembering the dead. Indeed, he observed that most Jews' tombstones do not have Stars of David. When asked what was wrong with honoring the war dead collectively, he responded that the war dead fought as Americans and not as Jews or Christians.

The Reverend John Stevens, Rector of the Episcopal Church of the Advent, testified regarding his interpretation of the religious symbols in the context of a public park. Reverend Stevens corroborated the testimony of Rabbi Osadchey by stating that the cross is the primary Christian symbol while the Star of David is the dominant symbol of Judaism. Specifically, he stated that the cross directs his thinking to the Crucifixion and encourages one to "bear witness to the resurrection of Christ." Reverend Stevens further testified that Commissioner Eckels' use of the symbols, which he strongly condemned as establishment of religion by the state, did not further religion but rather served to "water down" or adulterate the very precise religions of Christianity and Judaism, thereby creating a civil religion. Reverend Stevens stated unequivocally that Christian prayer does not require a cross and that the absence of a cross does not affect a Christian's ability to pray in an open field.

Like Rabbi Osadchey, Reverend Stevens believed that the use of only the two types of religious symbols at the proposed war memorial site erroneously implies that it is solely for the benefit of persons of those two religious persuasions. Reverend Stevens then testified regarding the pluralistic nature of religion in the Houston area. He listed the Southern Baptists, Methodists, Presbyterians, Catholics, Jews, Black Baptists, Humanists, Atheists, Black Muslims and Eastern Mystics as being only some of the various sects and religious faiths found in Houston.[5]

While Rabbi Osadchey briefly touched upon the issue of Humanism, Reverend Stevens testified in greater depth concerning his understanding of that religion.[6] Reverend Stevens defined Humanism as a non-theistic religion which states as one of its basic tenets that human beings control everything. He believed that while Humanists have the same ethics as Christians, the Humanist's object of worship is mankind rather than God. Finally, when questioned concerning the effect of removing symbols from the park, he stated that removal of the symbols would in no manner establish Humanism because something is not established by saying nothing about it.

The last clergyman witness produced by plaintiffs was the Reverend Jacob Frank Schulman, a minister in the Emerson Unitarian Church. Not unexpectedly, Reverend Schulman identified the cross as being an entirely Christian symbol and the Star of David as being the symbol for Judaism. He too objected strongly to any governmental sponsorship of religion.[7] He stated that in countries such as Mexico, Germany, England, France and Sweden, where there is governmental sponsorship of particular religions, religion has suffered. By way of example, he noted that in Sweden, where Lutheranism is the official religion, less than ten percent of the population attend church. He stated that when religion has to fight for its existence it remains strong; however, when government supports a religion, it becomes lazy and weak. He did not want to see the religious symbols become

---

**5.** This testimony was corroborated by the next witness, Reverend Frank Jacob Schulman. When Reverend Schulman was interrogated about the degree of religious diversity found in the Houston area, he listed the presence of a number of Buddhists, Sikhs, Islamics, Bahais, Christians, Jews, Jansenist, Shinto, and Persian Mystics as evidence of Houston's pluralistic religious composition.

**6.** Rabbi Osadchey testified that Humanism was a philosophy that rejects the notion of supernatural powers and instead teaches that humans are responsible for the fate of the world.

**7.** He also stated that the Unitarian Church had adopted a rigid separation of church and state stance.

secularized by the government's endorsement of them, nor did he wish to see religion become fused with patriotism.

A fair amount of Reverend Schulman's testimony was devoted to the recent history of Humanism, which began with the signing of the Humanist Manifesto I in 1933. He stated that while Humanists originally were not anti-theist, they did take strong exception to the phrase "Leave it to God" which was a popular Depression-era slogan. He testified that the Humanist developed an anti-theist theme in the late 1940's. This theme carried forward into the Humanist Manifesto II which was signed in 1973. He noted the basic tenet of Humanism to be that scientific proof can explain everything. It was his opinion that Humanism is a religion, and he cited in support of his opinion the government's recognition of Humanism as a religion by granting it tax-exempt status. When asked if the removal of the symbols would result in the advancement of non-theistic religions such as Humanism and Atheism, he responded that both Humanism and Atheism are positive assertions so that mere absence of traditional symbols does not advance them. In addition to objecting to the use of the symbols in the planned war memorial on the ground that it still would constitute governmental establishment of religion, he also stated his opposition to the slogan "In God We Trust" on currency and the use of religious symbols on the Tomb of the Unknown Soldier. However, he had no objection to the use of chaplains in the military, since he felt that the federal government was merely providing facilities that the servicemen lose because of being in the military.

Plaintiffs next called Commissioner Eckels as an adverse witness. Commissioner Eckels' testimony consisted largely of chronicling the events leading to the erection of the symbols, the public reaction to the symbols' existence, and the plans for a war or veterans' memorial at the site. He testified that the genesis of the idea for a meditation area in Bear Creek Park could be traced to the monthly townhall meetings held in 1980. He strongly believed that it was his duty to represent the wishes of his constituents and that the development of a meditation area accompanied by religious symbols, while authorized by him, was merely a reflection of what his constituents wanted.

He noted that the site he selected for the meditation area is located in a remote area of the park where it could be closely supervised by county park personnel who would ensure that the area was not used for sports activities or cook-outs.

He personally believed that the crosses represented the suffering of the common man and Christ, but readily admitted that the symbols were not necessary for a meditation area. Additionally, while the cross and Star of David are the only two religious symbols he presently intends to maintain at this particular site, should other persons of different religious persuasions request that the county erect their particular religious symbols, he would consider such requests. He further stated that the criteria for determining whether to honor such future requests would be the number of his constituents making the requests.

Commissioner Eckels testified that, in addition to being used as a meditation area, organized church services have been conducted at this site. Specifically, Easter sunrise services have been held each Easter Sunday since the symbols were first placed in the park and there has been at least one wedding ceremony. However, the Commissioner stressed that the county has never sponsored these church services but merely scheduled reservations for the orderly use of the site by various church groups.

Commissioner Eckels again stated that he reimbursed the county for the cost of construction of the symbols, a total of $114.96, because he believed that such a use of county funds was violative of the Constitution. He noted that the cost of maintaining the area, which consists primarily of the cost of cutting the grass, is more expensive than was the cost of con-

structing the symbols. Commissioner Eckels has not reimbursed the county for these maintenance costs.

When interrogated about the date of origin of the war memorial concept, Commissioner Eckels stated that he was first approached by Post 581 of the Veterans of Foreign Wars ("VFW") in 1981 about the possibility of a war memorial to honor the county's war dead.[8] On February 18, 1982, the Commissioners Court approved Commissioner Eckels' request to designate certain county park areas as memorial sites. The VFW subsequently sponsored a contest to select a design for the proposed war memorial. Eckels did not participate in the selection of the winning design, but he has worked closely with the VFW to get the war memorial built. He was aware of no discussions concerning the various religions of the war dead whom the county was honoring with the memorial.

Commissioner Eckels described generally the layout of the planned war memorial and its relationship to the rest of the park. As proposed, the crosses and Star of David will be located 239 feet from the war memorial. Separating the symbols from the war memorial is a large shelter. The shelter is in existence today and is approximately 72 feet from the symbols. Despite their distance from the war memorial, he stated that the crosses and Star of David are an integral part of the planned war memorial. As stated, these are the only two symbols that he intends to include at the war memorial site.

At the time of trial, the concrete for the memorial had been donated and the ground had been broken. However, Commissioner Eckels was not certain when the memorial would be completed as the $250,000 goal in private contributions to fund construction had not been reached. Finally, when asked what the purpose of the subject area is today, he stated that the concept of a meditation area has now merged with the more recent idea for the war memorial.

### B. *The Defendant's Case*

Commissioner Eckels called Henry Worsham, a member of VFW Post 581, as his first witness. Mr. Worsham stated that in July of 1982, Post 581 came up with the idea for the creation of a memorial to honor the veterans who fought in the Viet Nam War. He testified that a committee was established to oversee the development of such a memorial. On August 12, 1982, this committee met with some of Commissioner Eckels' aides to seek the Commissioner's assistance in the establishment of a veterans' memorial. Mr. Worsham stated that the idea was favorably received.

As noted by Commissioner Eckels, Mr. Worsham mentioned that the VFW sponsored a scholarship contest in the area schools to select a design for the planned memorial. (Defendant's Exhibit No. 3 is a sketch of that winning design and is attached to this opinion as Appendix A). He believed that the crosses and Star of David should be included as part of the memorial because the country's past wars have been fought for the American values represented by those symbols. Finally, while Post 581 participated in the selection of the winning design, they had nothing to do with the selection of the particular site for the memorial.

Jose Villareal, an American Legion member and Veterans Administration employee, also gave testimony regarding the creation of a war memorial. He too was a member of the six person war memorial committee. He claimed that the committee intended to include the symbols as part of the war memorial because they represented the traditional way to memorialize the dead. However, he was unaware of any committee effort to determine the particular religion of the war dead being honored.

H. Peter Dore, a general contractor who owns his own construction business in nearby Katy, Texas, gave testimony regarding the design and construction of the memorial. He first learned of the plans to construct a memorial in March of 1983.

---

**8.** At trial, Henry D. Worsham, a defense witness and member of VFW Post 581 stated that the general idea for a war memorial originated in July of 1982.

Subsequently, he contacted Commissioner Eckels' office and volunteered to build the war memorial on a non-profit basis. His motivation for building the war memorial on such a basis was that it was his way of thanking Houston for all of his personal good fortune.

He too contended that the existing crosses and Star of David were essential to the overall concept of this war memorial. He stated that he had already constructed sidewalks to connect the symbols with the shelter and the granite slabs which are to be the focal point of the memorial. In addition to the existing symbols, the plans call for the names of all the war dead to be engraved on the granite slabs with either a cross or Star of David next to the names.

Kathryn Lewis, President of the Gold Star Mothers, also testified about their efforts to obtain a local war memorial.[9] She stated that the Gold Star Mothers were represented on the committee that selected the winning design sketch previously discussed. She too felt that the crosses and the Star of David should be a part of the memorial.

Stan Horton, a Director of the Viet Nam Veterans Leadership Program and member of the war memorial committee, testified concerning his groups' effort to get a memorial in Harris County. He and his group were disturbed that the Houston area had no memorial honoring its Viet Nam veterans and that the area veterans exhibited no enthusiasm for such a memorial. He first learned of the efforts of Commissioner Eckels and other veterans' groups to construct a Houston memorial when he attended a veterans' ceremony at the National Cemetery in 1981. He stated that no religious groups were contacted by the war memorial committee regarding the establishment of such a memorial. He listed the VFW, the Gold Star Mothers, the Viet Nam Veterans of Houston and a Jewish Veterans group as organizations that were contacted regarding the establishment of a war memorial. It was his personal opinion that either the Gold Star Mothers or the deceased's family should have input in determining what type of religious symbol would be placed by the respective names of the deceased. He believed also that the crosses and the Star of David were appropriate additions to the memorial because other memorials such as the Tomb of the Unknown Soldier contain them.

The sole religious expert called by the defendant was Dr. Lynn Mitchell, a professor of theology at the University of Saint Thomas. It was his expert opinion that the religious symbols in the park serve the entirely secular purpose of memorializing the war dead. He also stated that the crosses and Star of David are part of the culture and tradition of this country. However, when pressed to elaborate on that statement, he was unaware of any other public park that contains these symbols.

Dr. Mitchell testified regarding his understanding of Humanism. He defined Humanism as a religion that totally rejects any belief in God and instead concentrates on the powers of man. He claimed that Humanism has a tremendous influence in the United States. He named astronomer Carl Sagan and English biologist/author Julian Huxley as two of the many scientists and teachers who are or have been adherents to Humanism. He believed that a basic goal of Humanism is to educate theistic believers out of their traditional religious views because Humanists believe that traditional religion is a roadblock to progress. Although he was not certain if Humanism had its own symbol, it was his opinion that, if the Court ordered the crosses and Star of David removed from the park, Humanism would be advanced or established. He later conceded that a court-ordered removal of the symbols could also be interpreted as a ruling based on constitutionally mandated neutrality. The defendant rested at the conclusion of Dr. Mitchell's testimony.

---

**9.** The Gold Star Mothers is an organization of mothers who have lost their sons or daughters in military service.

## C. *Plaintiff's Rebuttal*

Plaintiffs called as rebuttal witnesses Dr. James Eric Layne, a professor of religious studies at Rice University, and Steven Schafersman. After reviewing the testimony of Dr. Layne, the Court finds that it offered nothing in the nature of rebuttal evidence. Consequently, only the testimony of Mr. Schafersman will be recounted.

Mr. Schafersman is the Director of the South Central District of the American Humanist Association ("AHA"). The AHA is a tax-exempt, non-profit organization founded in 1943 to promote Humanism. The AHA boasts a membership of approximately 3500. The AHA's symbol or logo is known as the Happy Humanist. (Refer to Plaintiffs' Exhibits Nos. 13 and 14). According to Mr. Schafersman, the Happy Humanist is the universal symbol for Humanism.

Contrary to other plaintiffs' witnesses, Schafersman stated that Humanists do not deify or worship "mankind" at all. Instead, Humanists reject the notion of all supernatural beliefs and believe that all moral issues are resolved by human inquiry. Humanists view traditional religion as being based solely on wishful thinking rather than upon empirical evidence. Additionally, he claimed that Humanists accept the notion that the best knowledge of the universe comes from scientific sources. While he rejects the contention that Humanism is a religion *per se*, he does believe that it is a substitute for traditional theistic religion. He noted that there are Humanist counselors, marriage ceremonies and funeral services.

He further stated that Humanists are not out to eradicate all traditional, organized religions. He claimed that Humanism's goal is to promote Humanism through education, public speaking and politics. Humanists view traditional religion as wrongfully encouraging dependence on supernatural powers rather than independence based on man's knowledge. According to Schafersman, Humanists seek to educate society on the illogical aspects of traditional religion. Finally, when shown the design sketch of the proposed war memorial (Defendant's Exhibit No. 3), he to objected to the inclusion of the crosses and the Star of David. Upon the completion of Mr. Schafersman's testimony, the plaintiffs rested.

## IV. *Legal Analysis*

### A. *What This Case is Not About*

In the case at bar the Court focuses solely on the constitutional significance of three Latin-style crosses and a Star of David erected in a public park by the official act of a county commissioner so as to make available to the public an area for mediation and for the honoring of the county's war dead. Factually, this case does not involve recitations of religious prayer, Bible readings, moments of silence, on the teachings of evolution or creationism in public classrooms containing impressionable young minds. This cse raises no issues regarding taxpayer deductions for the costs of a child's parochial education or statutes authorizing reimbursement of transportation costs to parents of school children attending non-public schools. This case does not involve a state law delegating zoning powers to schools and churches or the propriety of posting the Ten Commandments in a schoolroom or a courtroom. This case raises no issues involving government sponsorship of a papal mass, tax-exemptions for religious organizations, Sunday closing laws, religious mottos on coins and currency, the opening of court sessions with requests for divine guidance or the ability of some religions to smoke peyote to the exclusion of other religions. This case bears no factual reemblance to cases reviewing state-compensated chaplains who open each legislative session with a religions prayer. Nor does this case concern governmental sponsorship of nativity scenes in public parks, in state capitols, at city halls or at the White House. Finally, this case is not about the erection of a large cross in a state park for the purpose of promoting tourism.

### B. *The Establishment Clause*

■ The First Amendment of the United States Constitution declares, in pertinent

part, that "Congress shall make no law respecting an establishment of religion." [10] This prohibition does not "require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and, forbids hostility toward any." *Lynch v. Donnelly,* —— U.S. at ——, 104 S.Ct. at 1359, (citing *Zorach v. Clauson,* 343 U.S. 306, 314, 315, 72 S.Ct. 679, 684, 685, 96 L.Ed. 954 (1952); *McCollum v. Board of Education,* 333 U.S. 203, 211, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948). This clause was made applicable to the actions of the states via the 14th Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). That Commissioner Eckels' actions while functioning in his official capacity as County Commissioner of Harris County may be the subject of First Amendment scrutiny is neither contested by the parties nor doubted by the Court.

Prior opinions of the Supreme Court have engaged in exhaustive discussions regarding the development and historical background of the First Amendment. *See, e.g., Marsh v. Chambers,* 463 U.S. ——, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983); *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). What Thomas Jefferson and James Madison were thinking during the relevant time periods has been well documented in other cases. Consequently, little benefit could be derived by this Court's attempting to improve upon those scholarly accounts of the First Amendment's heritage. Rather, this Court must focus upon what it perceives as the more difficult chore of selecting the approporiate standard of review and then applying it correctly to the facts of this case. Recent Supreme Court decisions have made the selection of the appropriate standard of review increasingly complicated.

"[C]ases arising under the [Religion] Clauses have presented some of the most perplexing questions to come before this Court." *Committee for Public Education v. Nyquist,* 413 U.S. 756, 760, 93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1973). As recently stated by the Supreme Court:

> In each case, the inquiry calls for line-drawing; no fixed, *per se* rule can be framed. The Establishment Clause, like the Due Process Clause is not a precise, detailed provision in a legal code capable of ready application. The purpose of the Establishment Clause "was to state an objective, not to write a statute." (citation omitted). The line between permissible relationships and those barred by the [Establishment] Clause can be no more straight and unwaivering than due process can be defined in a single stroke or phase or test. The Clause erects a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." (citation omitted).

*Lynch v. Donnelly,* —— U.S. at ——, 104 S.Ct. at 1361, 1362. In sum, this Court must draw "the [elusive] line that separates the secular from the sectarian ..." *Abington School District v. Schempp,* 374 U.S. 203, 231, 83 S.Ct. 1560, 1576, 10 L.Ed.2d 844 (1967) (Brennan, J., concurring).

The Supreme Court has repeatedly emphasized its "unwillingness to be confined to any single test or criterion in this sensitive area," *Lynch v. Donnelly,* —— U.S. at ——, 104 S.Ct. at 1362 (citations omitted). Yet, despite such proclamations, one test, at least until recently, had emerged as the seminal test for aiding courts in this delicate line-drawing process.[11] That test,

---

**10.** Actually, the First Amendment prohibits more than just the establishment of religion. The Amendment also provides: "Congress shall make no law respecting an establishment of religion *or prohibiting the free exercise thereof.*" (emphasis added). Neither plaintiffs nor defendant rely on the Free Exercise Clause in support of their respective positions.

**11.** That the *Lemon* test had become the settled test for Establishment Clause cases was well documented by Justice Brennan in his dissent in *Lynch v. Donnelly.* There, he stated:

which was crystallized in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), states that in order to be constitutionally sound, the challenged governmental action must have a secular purpose; its primary or principal effect must neither advance nor inhibit religion; and, it must not create excessive government entanglement with religion. *Id.* Should the challenged conduct fail to meet any of the three criteria, it is constitutionally infirm. *Stone v. Graham,* 449 U.S. 39, 40–41, 101 S.Ct. 192, 193–94, 66 L.Ed.2d 199 (1980) (*per curiam*).

However, because of recent aberrations from the Supreme Court's application of the traditional *Lemon* test, this Court's task is further complicated.[12] The random approach by the Supreme Court to its analysis of Establishment Clause cases impels this Court to analyze the facts of this case under all three tests presently thought to be employed by that Court in such cases. Fortunately, the task is not insurmountable, since, regardless of the test chosen, the result this Court reaches is the same.

1. *The Lemon v. Kurtzman Test*

   a. *Secular Purpose*

Under the traditional three part *Lemon* test, the first inquiry is whether the challenged governmental activity or practice has a secular purpose. Stated alternatively, "[w]hen a government permits religious symbols to be constructed on public property, its ability to articulate a secular purpose becomes the crucial focus under the Establishment Clause." *American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098, 1110 (11th Cir.1983) (citation omitted) (finding a religious purpose in erection of large illuminated cross in a state despite the avowed purpose of promotion of tourism). Further, "it is clear that an avowed secular purpose, if found to be self serving, 'may not be sufficient to avoid conflict with the First Amendment.' " *Id.* (citations omitted).[13]

In the instant case, two purposes for the erection of the symbols have been articulated by Commissioner Eckels. The initial purpose advanced for the presence of the symbols was to designate a place in the park where park-users could go to meditate. The second and later avowed purpose is that the symbols were to be a part of a planned war memorial to honor the county's war dead. Today, these stated purposes have merged and both are advanced

Although I agree with the Court that no single formula can ever fully capture the analysis that may be necessary to resolve difficult Establishment Clause problems, *see infra,* at n. 11, I fail to understand the Court's insistence upon *referring to the settled test set forth in Lemon* as simply one path that may be followed or not at the Court's option. See *ante,* at [1361–1362]. The Court's citation of *Tilton v. Richardson,* 403 U.S. 672 [91 S.Ct. 2091, 29 L.Ed.2d 790] (1971), and *Committee for Public Education v. Nyquist,* 413 U.S. 756 [93 S.Ct. 2955, 37 L.Ed.2d 948] (1973) to support this assertion is meaningless because both of those decisions applied the three-prong *Lemon* test. Indeed, ever since its initial formulation, the *Lemon* test has been consistently looked upon as the fundamental tool of Establishment Clause analysis. In *Nyquist,* the Court described the test in mandatory terms: "Taken together, [our] decisions dictate that to pass muster under the Establishment Clause the law in question [must satisfy the three elements of the *Lemon* test]." 413 U.S., at 772–773, [93 S.Ct., at 2965] And just last term in *Larkin v. Grendel's Den,* [459] U.S. [116] [103 S.Ct. 505, 74 L.Ed.2d 297] (1982), the Chief Justice, speaking for the Court wrote that "[t]his Court has consistently held that a statute must satisfy three criteria [as set forth in *Lemon* ] to pass muster under the Establishment Clause." *Id.,* at [123] [103 S.Ct., at 510]. *Lynch v. Donnelly,* —— U.S. at ——, n. 2, 104 S.Ct. at 1371, n. 2. (Brennan, J., dissenting). This Court notes further that the majority in *Lynch* returned to the application of *Lemon* in upholding city sponsorship of a Christmas nativity scene.

12. Further complicating the Court's analysis is the Supreme Court's uneven application of historical perspectives in deciding contemporary Establishment Clause cases. Fortunately, however, religious symbols in public parks have only a brief and narrow history.

13. In addition, "[t]he Court has taken the view that a secular purpose and a factual neutrality may not be enough, if in fact the State is lending direct support to a religious activity." *Roemer v. Maryland Public Works Board,* 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1975).

by Commissioner Eckels to support a finding of secular purpose. Considered separately or together, the Court is still unable to conclude that a secular purpose exists.

Perhaps the most glaring evidence of the symbols' religious purpose is a letter written by Commissioner Eckels on September 7, 1982 to the Reverend Stanley Aronson. (Refer to Plaintiffs' Exhibit No. 8). That letter, which, parenthetically, is devoid of any reference to the symbols as either part of a planned war memorial or as aids to meditation, evinces the Commissioner's concern about both the spread of Humanism and the preservation of our Judeo-Christian heritage. In the letter, he characterized this lawsuit as "an important step in returning to the values that America has deserted to her peril." That letter was written over seven months after the filing of this lawsuit.

Further proof of the Commissioner's religious purpose in erecting the symbols is the Commissioner's own repeated admissions that the use of county funds to construct the symbols was violative of the Constitution. Obviously, the Commissioner recognized that the symbols were erected for religious purposes in order to arrive at such a conclusion.[14] In other words, if the erection of these religious symbols truly had a secular purpose, Commissioner Eckels would not have made such admissions and thereafter concerned himself with reimbursing the county for the cost of construction of the symbols.

The Commissioner's belated purpose of using the symbols as an integral part of a planned war memorial still fails to resurrect the symbols from the depths of consti-

tutional infirmity. This is true because the use of religious means to achieve secular goals where nonreligious means will suffice is forbidden.[15] See Larkin v. Grendel's Den, 459 U.S. 116, 123, 124, 103 S.Ct. 505, 510, 510–11, 74 L.Ed.2d 297 (1982); Abington School District v. Schempp, 374 U.S. at 281, 83 S.Ct. at 1602 (Brennan, J., concurring). The removal of these four symbols, which are located over 230 feet from the planned war memorial, would in no way hinder the county's ability to honor its war dead. Indeed, the evidence reflects that the recently dedicated Viet Nam War Memorial in Washington, D.C. achieves this secular purpose without the use of any religious symbols. Additionally, Rabbi Osadchey stated that most Jews' tombstones do not even have Stars of David. Moreover, there was no evidence of a history or tradition of honoring the dead with crosses or Stars of David in public parks. In sum, because the county can effectively recognize its war dead without resort to the use of these religious symbols, it must do so.

b. *Effect*

The second prong of the *Lemon* test instructs the Court to determine whether the challenged actions of Commissioner Eckels have the primary or principal effect of either advancing or inhibiting religion. The Court can reach no other conclusion but that the symbols' primary or principal effect, like their purpose, is religious.[16]

That the cross and the Star of David are the primary symbols for Christianity and Judaism respectively is beyond question. That religious symbols such as these may

---

**14.** Of Course, whether county funds were used to construct the symbols is not determinative in the Court's over-all legal analysis. *See American Civil Liberties Union v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d at 1110 n. 22. However, the Court believes that the Commissioner's opinion on the use of county funds is probative of his true intent in erecting the symbols.

**15.** Likewise, the Commissioner conceded that neither meditation nor reflection require the presence of religious symbols. Consequently,

the use of religious symbols to foster this secular purpose is equally forbidden.

**16.** An interesting argument can be made that Commissioner Eckels' placement of the symbols in Bear Creek Park actually inhibits religion which, of course, is equally violative of the Establishment Clause. Rabbi Osadchey, Reverend Schulman, and Reverend Stevens testified that religious symbols in a county park have a detrimental effect on both Christianity and Judaism.

be a powerful medium for communicating messages has been recognized by the Supreme Court. In *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), the Court noted the power of symbolism when it stated:

> Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or banner, a color or design. The State announces rank, function, and authority through crowns and maces, uniforms and black robes; the church speaks through the Cross, the Crucifix, the altar and shrine, and clerical raiment. Symbols of State often convey political ideas just as religious symbols come to convey theological ones.

*Id.* at 632, 63 S.Ct. at 1182. The messages conveyed by these symbols are not lost when they are removed from the churches and synagogues with which they are traditionally associated. There is no danger here that the government's use of these symbols will be mistaken as merely a temporary governmental celebration of a religious holiday that has acquired some secular flavor. These permanent symbols become state symbols when placed in a public park, and they convey purely religious messages. If Commissioner Eckels is "utilizing the prestige, power, and influence" of his public office to bring religion into the lives of his constituents, the Establishment Clause is violated. *Walz v. Tax Commission*, 397 U.S. 664, 696, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring) (quoting *Abington School Dist. v. Schempp*, 374 U.S. at 307, 83 S.Ct. at 1616 (Goldberg, J., concurring).

Further, even if one strains to view the symbols in the context of a war memorial, their primary effect is to give the impression that only Christians and Jews are being honored by the county. The evidence is clear that these are not the only two reli-gions in Harris County nor the only two religions of the county's war dead. "The First Amendment mandates government neutrality between religion and religion, and between religion and non-religion." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). The Commissioner's overt favoritism of only two beliefs is a breach of the First Amendment's neutrality mandate, even if the symbols are considered to be aids to meditation or as part of a war memorial. To some, the Commissioner's endorsement may appear to be trivial and a tempest in a teapot. However, the power of a commissioner in county government is enormous. As the Supreme Court has stated, the "breach of neutrality that is today a trickling stream may all too soon become a raging torrent." *Abington School Dist. v. Schempp*, 374 U.S. at 255, 83 S.Ct. at 1589.

Finally, that the effect of the symbols' presence is religious is evidenced by what the site has been used for since the symbols were constructed. While the record is devoid of any evidence of the site being used by meditators, there was ample testimony from Commissioner Eckels that the site has been used for Easter sunrise services and at least one wedding. The symbols have had the effect of converting this site into an open air church on those occasions. There is nothing remotely secular about church worship, and the religious overtones of most weddings are undeniable.

### c. *Excessive Entanglement*

The final inquiry under *Lemon* is whether the existence of the symbols in a county park fosters excessive entanglement between the county and religion. Recognizing that "[s]ome relationship between government and religious organizations is inevitable," *Lemon v. Kurtzman*, 403 U.S. at 614, 91 S.Ct. at 2112 and cognizant that "[e]ntanglement is a question of kind and degree," *Lynch v. Donnelly*, —— U.S. at ——, 104 S.Ct. at 1364, the Court is of the opinion that the entanglement here is *de minimis*.

There is no evidence of Eckels' contact with church authorities concerning the content or design of the symbols prior to or since the construction of these symbols. *Lynch v. Donnelly*, —— U.S. at ——, 104 S.Ct. at 1364. There is no evidence of expenditures for maintenance of the symbols themselves. *Id.* The only evidence regarding maintenance expenditures is that it costs more to cut the grass surrounding the symbols than it did to construct the symbols. In all likelihood, the grass would have to be mowed even if the symbols were not present. The tangible material that the county contributed for the construction of the symbols, the value of which has since been reimbursed, was *de minimis.* "[T]he display [of these symbols] requires far less ongoing, day to day interaction between church and state than religious paintings in public galleries." *Lynch v. Donnelly*, —— U.S. at ——, 104 S.Ct. at 1364.

Plaintiffs cite the Commissioner's declaration that the site for the symbols was selected in order to facilitate the supervision of the area by county personnel as evidence of excessive entanglement. County personnel are apparently instructed to keep the meditation area free from barbecuers and sports enthusiasts. However, unlike the other areas of the park, there is no evidence that this area has picnic tables, cooking facilities, baseball diamonds or soccer fields. (Refer to Plaintiffs' Exhibits Nos. 1–4). Consequently, the need to keep this area free from such intruders is· questionable. Further, there is no evidence in the record that county personnel have ever actually policed the grounds to effectuate the Commissioner's desire to isolate this area for meditation. Here, unlike *Lynch*,[17] once the symbols were put in place, the County has had little contact with them.

However, the Court's inquiry into the issue of entanglement does not end with a finding of no administrative or institutional entanglement. Evidence of "political divisiveness" that is engendered by the challenged activity may reflect, when coupled with other findings of either an improper purpose and impermissible effect, excessive entanglement. *Donnelly v. Lynch*, 691 F.2d 1029, 1034 (1st Cir.1982), *rev'd on other grounds. Lynch v. Donnelly, supra.*

Plaintiffs cite correspondence received by Commissioner Eckels as evidence of the political divisiveness created by this lawsuit. (Refer to Plaintiffs' Exhibit No. 7). The tenor of the correspondence does reflect a certain polarization of his constituents. One group strongly believes that this lawsuit represents an attack by a communist-front organization on the presence of religion in society and supports the Commissioner's efforts to preserve the county's Judeo-Christian heritage. The other group questions the Commissioner's actions and suggests that he is violating the constitutional mandate of separation of church and state. They urge immediate removal of the symbols. Regardless, neither side's reaction is evidence of the kind of political divisiveness contemplated by the Supreme Court. "A litigant cannot, by the very act of commencing a lawsuit, however, create the appearance of divisiveness and then exploit it as evidence of entanglement."

---

**17.** The District Court in *Lynch* noted:

The nativity scene was purchased by the City in 1973 for $1,365. (I, 71–72). No money has since been expended on its maintenance. (*Id.*) This amount was comparable to that expended to purchase the three other large groupings—the carolers, the "village", and Santa's sleigh—that are part of the current display. The creche is assembled, removed, and stored by City workers; these tasks take a total of two worker-hours. (I, 67–68). Some additional time is spent by the City electrician in hooking up two spotlights to shine on the nativity scene. (I, 69). The Parks Director estimated that of the $4,500 spent for these employee services, about $20 was attributable to the creche. (I, 85). The City also spent a small amount, probably under $20, for spotlights, bulbs and holders to light the creche, (I, 78–79) and Pl.Ex. 7, and some unspecified sum for the electricity these use. (I, 72).

*Donnelly v. Lynch*, 525 F.Supp. 1150 at 1156. In that case, all three levels of Courts found that there was no institutional or administrative entanglement despite that degree of city involvement. In this case, the degree of tangible or physical entanglement is, as stated, *de minimis,* especially when compared to the Rhode Island case.

*Lynch v. Donnell,j,* —— U.S. at ——, 104 S.Ct. at 1365. Accordingly, the Court finds no evidence of political divisiveness in the present record which would catapult the Commissioner's actions into the prohibited zone of entanglement. In short, under the traditional three-prong *Lemon* test, the Commissioner's placement of the symbols in Bear Creek Park fails prongs one and two of the tripartite test but passes part three. Thus, under this test, the symbols must be removed.

### 2. *The Marsh v. Chambers Test*

In *Marsh v. Chambers,* 463 U.S. ——, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the Nebraska Legislature employed a Presbyterian minister as the official legislative chaplain to give an opening prayer at each state legislative session. The Supreme Court ruled 6–3 that this practice did not conflict with the Establishment Clause. In reaching this result, the Court ignored the traditional three-part *Lemon* test and instead relied primarily on history and tradition as well as the framers intent as bases for its holding. Specifically, the Court stated:

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public .body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country. As Justice Douglas observed, "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson,* 343 U.S. 306, 313 [72 S.Ct. 679, 683, 96 L.Ed. 954] (1952).

*Marsh v. Chambers,* 463 U.S. at ——, 103 S.Ct. at 3336. In other words, because Thomas Jefferson and James Madison, along with the other draftsmen of the Constitution who were members of the First Congress, employed a legislative chaplain, so may Nebraska without violation of the Establishment Clause. To ensure analytical completeness, this Court must make the attempt to apply this historical test to the facts of this case.

In the case at bar, there is a complete lack of evidence that our founding fathers were aware of the practice of placing crosses or Stars of David in public parks for either of the two purposes advanced by Commissioner Eckels. The defendant has cited the Court to no convention debates, personal letters of our founding fathers or written authorities that would even infer such a contention. Nothing in this record suggests that the use of these symbols in the present manner is interwoven into "the fabric of society." *Marsh v. Chambers,* 463 U.S. at ——, 103 S.Ct. at 3336. Although these religious symbols may be used in American veterans' cemeteries around the country and abroad, there is no history or pattern of their use in public parks for commemorating the war dead. While *Marsh* recognized that "standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees," 463 U.S. at ——, 103 S.Ct. at 3334, in this instance there is not even the existence of the threshold historical patterns apparently required under the *Marsh* analysis. Therefore, under this test as well, the symbols cannot remain.

### 3. *The Larson v. Valente Test*

The third and final test that the Court will undertake to apply to the facts of this case was employed by the Supreme Court in *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982).[18] In *Lar-*

---

**18.** Whether this is truly a separate test is not without some question. *See, e.g., Lynch v. Donnelly,* —— U.S. at —— n. 1, 104 S.Ct. at 1366 n. 1 (O'Connor, J., concurring) and *Id.* at ——, n. 2, 104 S.Ct. at 1371 n. 2 (Brennan, J., dissenting). Additionally, whether this test, if indeed a sepa- rate test, should even be applied in this case is not certain. *Lynch v. Donnelly,* —— U.S. at —— n. 13, 104 S.Ct. at 1366 n. 13. However, the Court wishes to ensure that no matter what test a later court may deem appropriate, this Court will have already examined its application.

*son v. Valente*, the Supreme Court struck down a Minnesota statute which denied an exemption from certain registration and reporting requirements to religious organizations receiving more than fifty per cent of their charitable contributions from nonmembers. The Court held that a statute or practice such as this fifty per cent rule, which explicitly discriminates among religions, "must be invalidated unless it is justified by a compelling governmental interest, *cf. Widmar v. Vincent*, 454 U.S. 263, 269–270 [102 S.Ct. 269, 273–274, 70 L.Ed.2d 440] (1981), and unless it is closely fitted to further that interest, *Murdock v. Pennsylvania*, 319 U.S. 105, 116–117 [63 S.Ct. 870, 876–877, 87 L.Ed. 1292] (1943)." *Larson v. Valente*, 456 U.S. at 247, 102 S.Ct. at 1685. The use of this strict scrutiny standard in the appropriate factual situation was recently sanctioned by the Supreme Court. *Lynch v. Donnelly*, —— U.S. at —— n. 13, 104 S.Ct. at 1366 n. 13.

Assuming its applicability, *Larson v. Valente* suggests the use of the strict scrutiny test in this case because of the Commissioner's actions in advancing only two religious beliefs through the erection of symbols in the park. In addition, the manner in which he would decide to erect additional symbols (if a sufficient number of constituents ask for their particular symbol to be erected, he would consider it) also calls for analysis pursuant to *Larson*. The first inquiry then becomes whether or not these endorsements of only Christianity and Judaism serve a compelling governmental interest. The Court, having previously found a religious purpose for the symbols' existence under the *Lemon* analysis, would be hard-pressed to find such a compelling governmental interest. Even accepting the Commissioner's purposes, there is nothing "compelling" about the county's need either to foster meditation or to honor its war dead. While both purposes may be characterized as legitimate purposes, neither is sufficiently urgent or substantive to attain the "compelling" status.

Assuming that the purposes advanced did serve compelling state interests, the Commissioner's actions in erecting the symbols still would have to be closely tailored to further those interests. However, the Commissioner chose only two symbols to commemorate the dead soldiers when the evidence of religious diversity in Houston is extensive. Collectively honoring all war dead with one broad stroke by erecting only two symbols and without reference to or concern for the deceased soldiers' true religious scarcely can be characterized as "closely tailored." The constructed symbols meet the same constitutional fate under this test.

C. *The Defendant's Reliance Upon Eugene Sand & Gravel, Inc.*

Finally, the Court is aware that today's decision is at odds with a 1976 decision of the Oregon Supreme Court that the defendant cites and relies upon as persuasive authority. In *Eugene Sand & Gravel, Inc. v. City of Eugene*, 276 Or. 1007, 558 P.2d 338 (1976), *cert. denied*, 434 U.S. 876, 98 S.Ct. 226, 54 L.Ed.2d 155 (1977), the Oregon Supreme Court held that a large concrete cross erected in a public park had a secular purpose.

Seven years earlier, that same court held that the city's sponsorship of the same cross violated the Constitution because the cross was a religious symbol and the city's action in allowing it to remain fostered the establishment of the Christian religion. *Lowe v. City of Eugene*, 254 Or. 518, 451 P.2d 117, 463 P.2d 360 (1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1366, 25 L.Ed.2d 654 (1970). Because of a "change of circumstances" since rendering its prior opinion, (*i.e.*, an amendment to the city charter which authorized the city to accept the cross as a gift and to designate it as a war memorial sponsored by a veterans' group) the court reversed its prior opinion and found the existence of the cross under such circumstances to be constitutionally sound. Like the Commissioner's most recent response in this case, this Court does not believe that the "changes in circumstances" in the Oregon case were sufficient to cure the prior constitutional infirmities. Regardless, the Court has considered the

Oregon Supreme Court's reasoning and, to the extent that it is inconsistent with this decision, finds it both non-binding and erroneous.[19]

### D. The Impact of Humanism

■ In a somewhat frenetic effort to save his actions from constitutional condemnation, defendant warns that a court-ordered removal of the symbols from Bear Creek Park would result in the Court's establishment of the non-theistic religion of Humanism.[20] The Court recognizes that "untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of noninterference and noninvolvement with the religions which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious." *Abington School District v. Schempp*, 374 U.S. at 306, 83 S.Ct. at 1615 (Goldberg, J., concurring). The Court disagrees, however, with the Commissioner's contention that the removal of the symbols will result in the creation of a Humanist haven in western Harris County.

The testimony of Reverend Stevens and Reverend Schulman plainly illustrate that an affirmative belief such as Humanism is not established by saying nothing about it. On the other hand, their testimony, along with Rabbi Osadchey's, also suggest that if Commissioner Eckels was concerned about combatting the spread of Humanism, he would not want to weaken the religions that he endorses by secularizing their symbols in the park as he has done. As noted by the court in *Engel v. Vitale*, 370 U.S. at

431, 82 S.Ct. at 1267, "many people [have] lost their respect for any religion that [relies] upon the support of government to spread its faith." (footnote omitted). Further, the defendant's sole expert religious witness, while claiming that the religion of Humanism would be established if the Court ordered the symbols' removal from the park, also conceded that such an order could be viewed as establishing nothing more than Constitutional neutrality. On the latter point, the witness was correct.

The proposition that Humanism or secularism will be established by the removal of religious practices or symbols from an institution where they previously existed is scarcely novel. Over twenty years ago in *Abington School District v. Schempp, supra*, it was urged that unless Bible readings were allowed to remain in public schools, a "religion of secularism" would be created. That contention was summarily dismissed. *Id.* at 225, 83 S.Ct. at 1573. The test of time has proven this fear to be unfounded. Further, if the Supreme Court was not concerned with that argument in a school context in which the religious practice that was being removed was far more established historically than that flowing from the erection of religious symbols in public parks, it is unlikely that the removal of these symbols would foster a greater concern.[21]

### V. Conclusion

Although it is certainly true that in 1952 Mr. Justice Douglas observed that "we are a religious people whose institutions presuppose a Supreme Being," *Zorach v.*

---

**19.** The correctness of the decision in *Eugene Sand & Gravel, Inc. v. City of Eugene, supra*, was also questioned by the Eleventh Circuit in *American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce*, 698 F.2d at 1110, n. 23.

**20.** The Supreme Court recognized Humanism as a religion in *Torcaso v. Watkins*, 367 U.S. 488, 495 n. 11, 81 S.Ct. 1680, 1684 n. 11, 6 L.Ed.2d 982 (1961).

**21.** The converse of this issue has already been addressed by a court. In *Crowley v. Smithsonian Institution*, 636 F.2d 738 (D.C.Cir.1980), the

court found that the sponsorship of exhibits containing references to the theory of evolution by a governmental entity, the Smithsonian Museum, did not constitute an establishment of secular humanism as a religion and posed no constitutional problems. Similarly, this Court's order removing the symbols of two of the myriad of faiths extant in Harris County on constitutional grounds can scarcely be viewed as advancing Humanism. This Court's removal of the symbols actually reflects far less day to day involvement with a particular belief than does a national museum's planned public display of evolutionary theory which appellant claimed constituted a position of faith or a religion.

*Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952), it is equally true today that the societal makeup of Harris County, Texas is vastly more pluralistic than it was over thirty years ago. The record in this case unqualifiedly reflects the multiple religions, sects and faiths that comprise the current burgeoning international community in which we live. The Constitution of the United States applies to all. If a county government is to adhere to its legal duty to remain neutral and even-handed in its representation of its tax payer-residents, it cannot engage in procedures which advance one or two faiths to the detriment of the others without violating fundamental constitutional values. Contrary to the principle of majority rule, the law is clear that the Constitution safeguards the rights of the minorities—in this case the rights of those who are not Christians and Jews. *See, e.g., Larson v. Valente,* 456 U.S. at 244–247, 102 S.Ct. at 1683–1685; *West Virginia Board of Education v. Barnette,* 319 U.S. at 638, 63 S.Ct. at 1185–1186 (One's right to ... freedom of worship ... and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.")

Admittedly, the trial court's duty to follow the law in the Establishment Clause area has been compounded in difficulty by the Supreme Court's recent pronouncements. If, in reality, the true test of an Establishment Clause violation remains the three prongs of *Lemon,* then the Commissioner's actions are hopelessly unconstitutional. Even if this is not so, this case, as earlier analysis has demonstrated, clearly fails the specific tests newly fashioned in those two opinions which apparently constitute narrow exceptions to *Lemon.*

Lest the Court become hopelessly mired in legal legerdemain and analytical quicksand, it should be reiterated that an Establishment Clause violation is triggered by affirmative state action which advances religion in a manner incompatible with constitutional values. If that is the malady to be guarded against as opposed to some benign incidental intrusion, the answer in this case becomes crystal clear. The Commissioner, acting in his official capacity as a county officer, simply had no sound legal basis for deliberately erecting symbols in a public park favoring Christians and Jews and thereby violating the governmental role of religious neutrality.

As was pointed out by Justice Brennan in his dissent in *Marsh v. Chambers,* —— U.S. at ——, 103 S.Ct. at 3351, Alexis de Tocqueville accurately assessed this issue over a century and a half ago. As a Frenchman and a Catholic, he was intimately familiar with the political and religious cross currents in his country in which Roman Catholicism predominates. His observations are illuminating:

The religious atmosphere of the country was the first thing that struck me on arrival in the United States....

In France I had seen the spirits of religion and of freedom almost always marching in opposite directions. In America I found them intimately linked together in joint reign over the same land.

My longing to understand the reason for this phenomenon increased daily.

To find this out, I questioned the faithful of all communions; I particularly sought the society of clergymen, who are the depositaries of the various creeds and have a personal interest in their survival.... I expressed my astonishment and revealed my doubts to each of them; I found that they all agreed with each other except about details; all thought that the main reason for the quiet sway of religion over the country was the complete separation of church and state. I have no hesitation in stating that throughout my stay in America I met nobody, lay or cleric, who did not agree about that. Democracy in America 295 (G. Lawrence, trans., J. Mayer, ed., 1969).

*Id.*

In view of the foregoing, the Court concludes that as a matter of law the presence of three Latin-style crosse and a Star of David in Bear Creek Park offends the Establishment Clause of the First Amendment, and, consequently, they must be removed. "The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement are inevitable, lines must be drawn." *Lemon v. Kurtzman, supra,* 403 U.S. at 625, 91 S.Ct. at 2117. The line drawn by the Court today was not hastily traced or cavalierly placed. This decision in no way impedes the park users' ability to pray to their respective gods or practice their individual disciplines. This opinion in no manner restricts the county's ability to properly honor its war dead. All that this opinion reflects is the Court's application of binding legal principles in order to achieve and maintain the delicate balance between religion and religion, religion and non-religion, and religion and government as mandated by the First Amendment.

In the event that the foregoing Findings of Fact also constitute Conclusions of Law, they should be treated as such. In the event that the foregoing Conclusions of Law also constitute Findings of Fact, they are adopted as such.

Counsel for plaintiffs is instructed to submit within ten (10) days an appropriate final judgment incorporating by reference these Findings of Fact and Conclusions of Law.

242

APPENDIX A

WINNING DESIGN SKETCH OF THE PROPOSED VETERANS MEMORIAL

DEFENDANT'S EXHIBIT NO. 3

Anne McClain Johnson, Herbert E. Buhl, III, Columbia, S.C., for plaintiff.