**Jon G. MURRAY and Society of Separationists, Inc., Plaintiffs–Appellants,**

v.

**CITY OF AUSTIN, TEXAS and Travis County, Texas, Defendants–Appellees.**

No. 90–8561.

United States Court of Appeals, Fifth Circuit.

Nov. 4, 1991.

Rehearing Denied Dec. 3, 1991.

not participate in this decision.

John W. Vinson, Austin, Tex., for plaintiffs-appellants.

Orlinda L. Naranjo, Asst. Co. Atty., Austin, Tex., for defendants-appellees.

Before GOLDBERG, SMITH, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

Today, we address an issue grounded in part of the bedrock on which our Country stands—freedom of religion. The issue springs from the inclusion of a Christian cross in the insignia of the City of Austin, Texas. The cross found its way into the insignia because it was part of the coat of arms of the person for whom the City is named, Stephen F. Austin, the "father of Texas".

Jon Murray and the Society of Separationists, of which he is a member, sued the City, among others, claiming that the insignia violates the Establishment and Free Exercise Clauses of the First Amendment (as incorporated by the Fourteenth Amendment), because it contains the cross, among other symbols. Agreeing that there are no disputed issues of material fact, the parties filed cross-motions for summary judgment. The district court granted summary judgment for the City and *sua sponte* imposed Rule 11 sanctions against Murray and the Society. 744 F.Supp. 771 (W.D.Tex.1990).[1] We AFFIRM the summary judgment, but VACATE the award of sanctions.[2]

## I.

In 1916, the Austin City Council sought proposed designs for a municipal flag and chose a design that incorporated, with some modifications, the family coat of arms of Stephen F. Austin, the "father of Texas"

and the person after whom the City is named. The original Austin family coat of arms was a crest with three cross-crosslets and a wreath, supporting a Latin cross between two wings. (A Latin cross is the symbol of the Christian religion; its three upper arms are shorter than the lower arm, while a crosslet is "a small cross; *esp:* one used as a heraldic bearing". Websters New Collegiate Dictionary 308–09, illustrations 1 and 18 (9th ed. 1989). A cross-crosslet is defined as "*heraldry:* a cross with a crossbar near the end of each arm". Websters New International Dictionary 541 (3d ed. 1986).) The Latin cross in the coat of arms signified that a progenitor had participated in a crusade; and the wings represented St. Austin (also known as St. Augustine), the Archbishop of Canterbury. (*See* Appendix 1.) Stephen F. Austin modified the original coat of arms by replacing the three cross-crosslets with a deer's head to symbolize that he was an American pioneer. He also changed the Latin cross atop the crest into a form of cross-crosslet: a Latin cross with crosslets on only the three upper arms. (*See* Appendix 2.)

For its insignia, the City has used an adaptation of Stephen F. Austin's coat of arms. The insignia is a circle with "CITY OF AUSTIN" written circumferentially across the top and "FOUNDED 1839" across the bottom. Inside the circle is a shield formed by three vertical stripes, with an inverted triangle at the top of the shield. Inside the triangle is a lamp of knowledge, representing "the educational advantages of the City." (For example, the University of Texas is located at Austin.) Atop the shield is the silhouette of the State capitol, and superimposed on the capitol is the Latin cross with crosslets on the three upper arms, surrounded by a pair of wings. (*See* Appendix 3.) The insignia

1. Plaintiffs also claimed that the insignia violated the Texas Bill of Rights of the Texas Constitution, article I, sections 6 and 7, which respectively provide for freedom of worship and prohibit appropriations for sectarian purposes. After disposing of the federal claims, the district court dismissed these state law claims on the bases that they were frivolous and pendent (now "supplemental"; *see* 28 U.S.C. § 1367).

744 F.Supp. at 776. Appellants do not raise them on appeal.

2. *See* Fed.R.Civ.P. 56. It is more than well-established that our review of a summary judgment is plenary. *E.g., Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir.1991).

is used on police cars and other city vehicles, letterhead, monthly utility bills, uniforms of city employees, including police and firefighters, on the wall of the city council chambers, and on or in many city-owned buildings, parks, and recreation centers. (*See* Appendix 4.)

Murray's summary judgment affidavit stated, among other things: that he lives and works in Austin, receives many items of correspondence from the City and uses its public services, including police and fire protection and water, electric, garbage, and utility services; that he has visited the chambers of the Austin City Council and the City's municipal building; that the Christian cross in the insignia is used only by the Roman Catholic denomination; that the fact that his city uses "such a religious symbol truly offends" him; that he does "not subscribe to the religion symbolized nor to the particular sect of that religion which is further symbolized"; that he personally confronts the insignia in "many locations around the City," including the monthly utility bills he receives at his home and at the Society's offices; that use of the insignia by the City is an endorsement of Christianity in general and the Roman Catholic faith in particular; that "only after research into the seal[3] and the cross did [he] become aware that the cross was part of Stephen F. Austin's coat-of-arms"; that he has "experienced police hostility in the past when police protection was needed"; that he fears that this may have been because of the City's association with Christianity and his status as a "well known atheist spokesperson"; and that he is also "distressed that some portion of [his] City tax contribution or ... utility payments goes to advertising religion."

## II.

At issue is whether the insignia violates the Establishment and Free Exercise Clauses of the First Amendment, which provides in relevant part: "Congress shall make no law respecting an establishment

of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I. As noted, the cross depicted in the insignia is a Latin cross with three crosslets, which Murray states is used particularly by the Roman Catholic faith. However, the challenge is not to a particular denomination being represented. Instead, Murray relies on what he perceives as the representation of Christianity. And, he asserts that although the cross does not occupy much space in the insignia, it is a prominent part of it; that because of its color and location, as well as its being surrounded by a pair of wings, "[a]ll attention is drawn to" it.

The resolution in 1916 soliciting designs for the City's flag makes no mention of the cross or Christianity, instead solicits designs of "artistic merit" expressing "some salient characteristics of the city", and suggests as possibilities use of

[t]he natural beauty of Austin, the City of the Violet Crown, the lake and dam, the Capital of the State, the dome of the Capitol, the seal of the city, and educational center, its industries, the sentiment of its past history, the derivation of the name—from Stephen F. Austin, an expression of the ideals of Stephen F. Austin in symbolic form, the use of the coat of arms of Stephen F. Austin.

Nor is there any reference to the cross in the resolution in 1919 adopting the design. The resolution describes the emblem as a shield with a silhouette of the Capitol crowning the whole

and woven into this silhouette is the crest to the coat-of-arms of Stephen F. Austin, after whom the City of Austin was named. The entire design is a modified form of the Austin coat-of-arms. In the center ... is a golden lamp of knowledge, typifying the educational advantages of Austin....

Although the cross is included in the insignia because it was part of Stephen F. Austin's coat of arms, it is a Christian cross nonetheless. While the reason for its being in the insignia is one of the factors

---

**3.** The parties use the terms seal and insignia interchangeably; however, the seal of Austin is a star.

we consider, we cannot avoid reaching the First Amendment issue simply because the cross was not placed in the insignia for religious purposes. It was in the original coat of arms to denote that an ancestor had participated in a crusade. But of far more significance, anyone seeing the insignia sees a Christian cross. We cannot expect persons viewing it to have researched its origin beforehand, any more than we can expect the City to include a disclaimer with it.

### A.

 As a threshold issue, we must, of course, be satisfied that Murray and the Society have standing to challenge the insignia.[4] To establish standing under Article III of the United States Constitution, a litigant must demonstrate:

> [1] that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant ...
>
> [2] that the injury "fairly can be traced to the challenged action" and
>
> [3] [that the injury] "is likely to be redressed by a favorable decision."

*Cramer v. Skinner*, 931 F.2d 1020, 1024 (5th Cir.1991) (brackets in *Cramer*) (quoting *Valley Forge Christian College v. Americans for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)), *cert. denied*, —— U.S. ——, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991). And in so deciding, "a court should consider three prudential concerns":

> 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue;
>
> 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and
>
> 3) whether the plaintiff is asserting his or her own legal rights and interests

rather than the legal rights and interests of third parties.

*Cramer*, 931 F.2d at 1024–25 (citations omitted).

Murray asserts that his earlier described affidavit establishes that he and the Society have standing under general standing principles and that he has standing as a municipal citizen and taxpayer. Concerning the former, see, e.g., *Foremaster v. City of St. George*, 882 F.2d 1485, 1490–91 (10th Cir.1989) ("allegations of direct, personal contact [with municipal logo] suffices as non-economic injury"), *cert. denied*, —— U.S. ——, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); *Saladin v. City of Milledgeville*, 812 F.2d 687, 692–93 (11th Cir.1987) (receipt of city correspondence and proclamation bearing challenged seal sufficient to confer standing); *compare Harris v. City of Zion*, 927 F.2d 1401, 1405 (7th Cir.1991) (use of city seal on automobile tax stickers and garbage bags which plaintiffs were required to use *and* plaintiffs' *altering* their travel routes to avoid viewing seal painted on city water tower sufficient to confer standing), *petitions for cert. filed*, (U.S. July 19, 1991) (No. 91–141) and (U.S. Aug. 19, 1991) (No. 91–299).

 Although "the concept of injury for standing purposes is particularly elusive in Establishment Clause cases," *Saladin*, 812 F.2d at 691 (citation omitted), Murray has alleged sufficient injury to confer standing. In so ruling, we attach considerable weight to the fact that standing has not been an issue in the Supreme Court in similar cases, such as *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (plaintiffs were the American Civil Liberties Union and residents of the community in which the crèche in issue was displayed in a private park, who were also members of the ACLU) and *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (plaintiffs were the ACLU and several residents of a community where a crèche and a

---

4. We raised this issue *sua sponte* at oral argument. At that time, the City contested standing—apparently for the first time—but requested that we assume standing and rule on the merits. However, after argument, when both sides filed briefs on standing, the City contested it.

menorah were displayed in the County Courthouse and just outside the City–County Building respectively). *Compare Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485–87, 102 S.Ct. 752, 765–67, 70 L.Ed.2d 700 (1982) (where plaintiffs learned of challenged conduct through the media and did not live in or near the alleged offending state, the Court held no standing for federal taxpayer grievance nor for "psychological consequence presumably produced by observation of conduct with which one disagrees").[5] And, because Murray has standing, the Society, of which he is a member, also has standing. *Warth v. Seldin*, 422 U.S. 490, 511, 515, 95 S.Ct. 2197, 2211, 2213, 45 L.Ed.2d 343 (1975); *Harris v. City of Zion*, 927 F.2d at 1401, 1405.

### B.

We quickly dispose of the Free Exercise Clause and sanctions issues.

### 1.

■ The free exercise claim is based on Murray's assertions that "[t]here is at least subtle coercion for the Plaintiffs to adhere to the majoritarian faith symbolized by the cross in the seal" and that Austin residents are "forced to support an official municipal seal bearing the cross." However, this contention reaches well beyond the purview of the Free Exercise Clause.

The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment obviously excludes all "governmental regulation of religious beliefs as such." The government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma.

*Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, ——, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990) (emphasis and citations omitted). None of these concerns is implicated. Murray fails to articulate a sufficient burden or restriction imposed on the free exercise of his religion (or non-religious beliefs) or to offer any authority in support of his "subtle coercion" argument.[6]

We agree with the district court that Murray's claim is a "far cry from cases dealing with actual interference ... or actual compulsion" which have presented viable Free Exercise claims. 744 F.Supp. at 775; *see, e.g., Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (invalidating compelled display of "Live Free or Die" on license plate); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (invalidating law requiring compulsory school attendance); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (invalidating compulsory flag salute). His argument is without merit.

### 2.

■ Equally unavailing is the City's attempt to justify the sanctions. In *sua sponte* imposing them under Fed.R.Civ.P. 11, the district judge stated that Murray had failed to present any evidence in support of his excessive entanglement and free

---

**5.** Accordingly, we need not address his alternative assertion of standing, based upon his being a municipal taxpayer. *See, e.g., Valley Forge*, 454 U.S. at 482–83, 102 S.Ct. at 764–65; *Doremus v. Board of Educ.*, 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952). And, although Murray alleges sufficient injury to confer standing to challenge the insignia as violative of the Establishment Clause, he arguably lacks standing to assert his Free Exercise claim. Murray fails to allege a substantial or significant burden on the exercise of his religion (nonreligion). *See* part II.B.1 *infra* and Smith,

**6.** Indeed, Murray concedes that he could find no case law to support his argument.

*Symbols, Perceptions, and Doctrinal Illusions: Establishment Neutrality and the "No Endorsement" Test*, 86 Mich.L.Rev. 268, 300 (1987) (noting that generally under the Free Exercise Clause, a plaintiff must show a "substantial" or "severe" burden on the exercise of his or her religion, but suggesting that under the "endorsement" test, discussed *infra,* all that may be required is an assertion that one "feels like an 'outsider' ").

exercise claims.[7] We review the imposition of Rule 11 sanctions under the abuse of discretion standard. *Thomas v. Capital Security Servs., Inc.,* 836 F.2d 866, 872 (5th Cir.1988) (en banc).

■ The City devoted one paragraph in its brief to this issue and cited no authority for the sanctions.[8] Moreover, in requesting oral argument before this court, the City stated that the issues presented "have not been addressed by this [c]ourt or authoritatively decided by the United States Supreme Court [and] ... are of an important and consequential nature...." Although we agree with the district court that Murray's claims are unavailing, we conclude that his contentions do not violate Rule 11, which provides for sanctions if a claim is not "well grounded in fact and is [not] warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Murray's claims are, at the very least, protected by the "good faith argument" provision in Rule 11, especially for this sensitive area. *See infra.* They do not fail Rule 11's standards.[9]

### C.

The critical issue is whether the insignia can withstand Establishment Clause challenge. As with most Establishment Clause cases, our review "is a delicate task." *County of Allegheny,* 492 U.S. at 623, 109 S.Ct. at 3117 (O'Connor, J., concurring in part and in the judgment). The exceedingly great flexibility that must be applied in such review is well-stated in *Lynch,* 465 U.S. at 678-79, 104 S.Ct. at 1361-62 (citations omitted):

> In each case, the inquiry calls for line-drawing; no fixed, *per se* rule can be framed. The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application. The purpose of the

Establishment Clause "was to state an objective, not to write a statute." The line between permissible relationships and those barred by the Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship."

■ Murray asserts violation of the Establishment Clause pursuant to the *Lemon* test. In order to pass constitutional muster under it, a statute or other governmental practice (1) "must have a secular legislative purpose; ... [2] its principal or primary effect must be one that neither advances nor inhibits religion; ... [and (3) it] must not foster 'an excessive government entanglement with religion.'" *Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111–12 (citations omitted) (emphasis added). On appeal, Murray relies solely on part two of the test, the "effects" prong, conceding that the City did not have an inappropriate purpose in using the insignia and that its use does not involve excessive entanglement between government and religion. *Lemon* was decided in 1971. More recent cases, such as *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), *Lynch* (1984) and the most recent pronouncement, *County of Allegheny* (1989), are attempts to explain or clarify, if not find a better approach than, *Lemon.* *See, e.g.,* the opinion for the Court in *Lynch,* 465 U.S. at 679, 104 S.Ct. at 1362:

> In the line-drawing process we have often found it useful to inquire whether the challenged law or conduct has a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement of government with religion. *Lemon, supra.* But, we have repeatedly emphasized our unwillingness

---

7. The excessive entanglement claim was made under the three-part test from *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). This claim is not raised on appeal. See *infra.*

8. The City cited only *Thomas,* 836 F.2d at 866 (providing the appropriate standard of review for Rule 11 sanctions and other general guid-

ance, but offering no support for the imposition of sanctions in this context).

9. Moreover, although the City does not argue any alternative bases for affirming the imposition of sanctions, we have carefully reviewed the record and find none.

to be confined to any single test or criterion in this sensitive area. See, e.g., *Tilton v. Richardson*, 403 U.S. 672, 677–678 [91 S.Ct. 2091, 2095–96, 29 L.Ed.2d 790] (1971); [*Committee for Public Education and Religious Liberty v.*] *Nyquist*, 413 U.S. [756,] 773 [93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973)]. In two cases, the Court did not even apply the *Lemon* "test." We did not, for example, consider that analysis relevant in *Marsh*. . . . Nor did we find *Lemon* useful in *Larson v. Valente*, 456 U.S. 228 [102 S.Ct. 1673, 72 L.Ed.2d 33] (1982), where there was substantial evidence of overt discrimination against a particular church.

See, e.g., *Jones v. Clear Creek Independent School Dist.*, 930 F.2d 416, 419 (5th Cir.1991) (*Lemon* was proper test to apply when determining constitutionality of school district resolution allowing student volunteers to present nonsectarian, nonproselytizing graduation prayers), *petition for cert. filed*, (U.S. Aug. 20, 1991) (No. 91–310); *Jones*, 930 F.2d at 424 (Garwood, J., concurring) (agreeing that *Lemon* test, "the challenged policy's highest hurdle", was met, but declining to decide whether "some less restrictive or rigid test might be more properly applied").

■ The judgment in *Lynch* resulted from the concurring opinion by Justice O'Connor, in which she stated that "[f]ocusing on institutional entanglement and on *endorsement* or disapproval of religion clarifies the *Lemon* test as an analytical device." 465 U.S. at 689, 104 S.Ct. at 1367 (emphasis added). The Supreme Court was far more divided, indeed fractured, in *County of Allegheny*, in which the endorsement test employed by some of the Justices was rivaled by a coercion test espoused by four: "Non-coercive government action within the realm of flexible accommodation or passive acknowledgment of existing symbols does not violate the Establishment Clause unless it benefits religion in a way more direct and more substantial than practices that are accepted in our national heritage." 492 U.S. at 662–63, 109 S.Ct. at 3137–38 (Kennedy, J., concurring in

the judgment in part and dissenting in part). We need not discuss further the differing views advanced in *County of Allegheny*. Suffice it to say that there is no one readily and easily applicable test. Perhaps, because of the sensitivity of this area, this is as it should be. And, it may well be that *Lynch*, including as discussed below, provides all the guidance that is necessary, at least for this case. However, as further discussed below, this wish is belied by the sharply divided Court in *County of Allegheny*. Accordingly, for this case, not only must we attempt to apply *Lemon*, but we must look to *Lynch*, *Marsh*, and *County of Allegheny* as well.

The *Lemon* "effects" prong asks whether the insignia's principal or primary effect advances or inhibits religion; if it does, it violates the First Amendment. But, one of the difficulties in applying *Lemon*, especially in a non-statutory context as is present here, is knowing the proper scope or reach of "principal or primary effect". If we focus exclusively on the inclusion of the religious symbol, display, or practice, then every use of religious symbolism—and prayer—would fail. The plain wording of the First Amendment does not require this; nor does the Supreme Court. For example, as discussed in *Lynch*, 465 U.S. at 676–77, 104 S.Ct. at 1360–61:

> Art galleries supported by public revenues display religious paintings of the 15th and 16th centuries, predominantly inspired by one religious faith. The National Gallery in Washington, maintained with Government support, for example, has long exhibited masterpieces with religious messages, notably the Last Supper, and paintings depicting the Birth of Christ, the Crucifixion, and the Resurrection, among many others with explicit Christian themes and messages. The very chamber in which oral arguments on this case were heard is decorated with a notable and permanent—not seasonal—symbol of religion: Moses with the Ten Commandments.

In addition, much more direct, as well as permanent, government use of religious acknowledgment, if not religious belief, is allowed: *e.g.*, "In God We Trust" printed on United States Currency; opening court sessions with "God save the United States

and this honorable court"; the pledge of allegiance; and legislative prayers. *E.g., Lynch,* 465 U.S. at 674–78, 104 S.Ct. at 1359–62; *Jones v. Clear Creek Independent School Dist.,* 930 F.2d at 421. Indeed, the Supreme Court has rejected focusing exclusively on the religious component of a challenged action. *E.g., Lynch,* 465 U.S. at 678, 104 S.Ct. at 1362.

Conversely, if we need ask only if the City's insignia, as a whole, has the principal or primary effect of advancing or inhibiting religion, the answer must be no. Taken as a whole, the insignia has the principal or primary effect of identifying city activity and property and promoting Austin's unique role and history. But, appellants contend that the use of a Christian cross by the City in its insignia represents a more compelling challenge than the approved activities described above, such as nonsectarian prayer (even though, at a minimum, prayer implicates preference for religion over nonreligion), including the fact that it is permanent, as opposed to seasonal. Consistent with this contention, and "[h]owever history may affect the constitutionality of nonsectarian references to religion by the government, history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed." *County of Allegheny,* 492 U.S. at 602, 109 S.Ct. at 3105.

Simply put, we do not find that Austin's insignia demonstrates a preference for Christianity. To the extent that the Establishment Clause prevents preferences for one religion over another, it likewise prevents preferences for religion over nonreligion. The crèche (a Christian symbol) in *Lynch,* the menorah (a Jewish symbol) in *County of Allegheny,* the legislative prayer in *Marsh,* and the above-discussed references by government to God have been held not to transgress the Establishment Clause. We view any perceived preference by use of the insignia to be even more remote than in the above-referenced cases.

In *Marsh,* the Court upheld the Nebraska Legislature's practice of opening each session with a prayer by a state-employed clergyman, based on both the practice's unique history and the lack of any evidence tending to show that "the prayer opportunity [was] exploited to proselytize or advance any one, or to disparage any other, faith or belief." 463 U.S. at 794–95, 103 S.Ct. at 3337–38. The Court stated:

> Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees, but there is far more here than simply historical patterns. In this context, historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress—their actions reveal their intent.

*Id.* at 790, 103 S.Ct. at 3335. The Court elaborated on the "weight to be accorded to history", citing *Walz v. Tax Comm'n,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970):

> "It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it. Yet an unbroken practice ... is not something to be lightly cast aside."

*Marsh,* 463 U.S. at 790, 103 S.Ct. at 3335 (quoting *Walz,* 397 U.S. at 678, 90 S.Ct. at 1416). Because of the practice's history and the want of any evidence of an intent "to proselytize or advance any one, or to disparage any other, faith or belief," the *Marsh* Court concluded that the legislative prayer presented "no real threat" of an establishment of religion. *Id.* at 794–95, 103 S.Ct. at 3337–38; *see also id.* at 792, 103 S.Ct. at 3336.

Admittedly, we lack the kind of evidence of original intent present in *Marsh.* Yet this case does share some important similarities with *Marsh:* a long-standing unique history, absolutely no evidence of an intent to proselytize, or advance, any religion, and no threat of an establishment of religion. As stated in *Lynch,* 465 U.S. at 686, 104 S.Ct. at 1366: "Any notion that [this] symbol[] pose[s] a real danger of establishment of a state church is far-fetched indeed."

In *County of Allegheny,* the Court upheld the display of a menorah during the

holiday season. It was placed outside the City–County building, next to a Christmas tree, and accompanied by a sign entitled "Salute to Liberty." The Court found the display did not have "the effect of promoting or endorsing religious beliefs" in its "particular physical setting." 492 U.S. at 621, 109 S.Ct. at 3115. By contrast, a closely divided Court held that the contemporaneous display of a crèche in the County Courthouse did have an impermissible effect. *Id.*[10] The Court was influenced heavily by the absence of anything to detract from the crèche's religious message and its placement in the "main" and "most beautiful part of the building." *Id.* at 579, 109 S.Ct. at 3093.

The effect of the displays was analyzed under the earlier referenced endorsement test urged by Justice O'Connor in her concurrence in *Lynch.* Specifically,

> [t]he effect of a display [or use of religious symbolism] depends upon the message that the government's practice communicates: the question is "what viewers may fairly understand to be the purpose of the display." That inquiry, of necessity, turns upon the context in which the contested object appears.... Every government practice must be judged in its unique circumstances to determine whether it [endorses] religion.

*County of Allegheny,* 492 U.S. at 595, 109 S.Ct. at 3102 (brackets in *County of Allegheny*) (citations omitted). To be considered is whether "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Id.* at 597, 109 S.Ct. at 3103 (quoting *School District of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985)). The greatly differing views in *County of Allegheny* notwithstanding, it appears that "the government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious

symbolism depends upon its context." *Id.* "Under the endorsement test, the 'history and ubiquity' of a practice is relevant ... because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." *County of Allegheny,* 492 U.S. at 630, 109 S.Ct. at 3120 (O'Connor, J., concurring in part and in the judgment).

In light of the guiding Supreme Court case law, and giving special consideration to the endorsement test used in *County of Allegheny,* we decline to hold that any time a municipality incorporates a religious symbol within its seal, insignia, or logo—regardless of the history, purpose, or context—the Establishment Clause is violated. To do so is inappropriate in the difficult area of Establishment Clause analysis dominated by subtle nuances, and it accords too little deference to both our nation's religious and cultural heritage and practices and the Supreme Court's guidance. In holding that Austin's insignia does not violate the First Amendment, we recognize that two of our sister circuits have found establishment clause violations when municipal seals included religious symbolism. We do not view this as a split with our circuit. Instead, it is further evidence, as discussed in *Lynch,* for example, that such cases must be decided on their facts.

In the most recent of the two cases, decided after *County of Allegheny,* the Seventh Circuit addressed challenges to the seals for the cities of Zion and Rolling Meadows, Illinois. *Harris v. City of Zion,* 927 F.2d 1401 (7th Cir.1991), *petitions for cert. filed,* (U.S. July 19, 1991) (No. 91–141) and (U.S. Aug. 19, 1991) (No. 91–299). Zion's seal depicted a shield containing a cross, a dove, a crown, a scepter, and a banner across the top of the shield proclaiming "God Reigns". *Id.* at 1417 (appendix containing seal). Rolling Meadows' contained a cross in front of a one-story building, a water tower, two industrial buildings, and a leaf. *Id.* at 1403–04, 1416 (appendix containing seal). The Seventh

---

**10.** Justice Kennedy, joined by Chief Justice Rehnquist, and Justices White and Scalia would have upheld the display of the crèche. 492 U.S. at 655, 109 S.Ct. at 3134 (Kennedy, J., concurring and dissenting in part).

Circuit recognized that the context of the displays was crucial, but nevertheless found that the seals could not be saved by other secular symbols and concluded that the "sectarian religious imagery simply [had] no place on municipal seals." *Id.* at 1402.

We may quickly dispense with any comparison between the insignia for Zion and Austin. Zion's contained only sectarian symbols and was adopted for an express religious purpose. *Id.* at 1403–04. There are also obvious distinctions between those for Rolling Meadows and Austin. For example, the size and placement of the cross in the Rolling Meadows' seal arguably conveys a message of its being a "Christian community". In fact, the one-story, industrial-appearing building depicted behind the cross in that seal is a depiction of a church that was being constructed when the proposed seal was adopted in 1960. 927 F.2d at 1403, 1416 (appendix containing seal). The cross is as tall as the water tower and taller than the building behind it. *Id.* at 1416 (appendix containing seal). The court concluded that "[t]he images on the seal [were] not neutral snapshots of the community; [but rather] they [were] charged with endorsement." *Id.* at 1412. This endorsement caused the seal to fail. *Id.* at 1413. However, we do not read *Harris* to hold that any use of a cross in a seal would cause the same result. *Id.*

In the second case, rendered prior to *County of Allegheny*, the Tenth Circuit addressed an Establishment Clause challenge to a municipal seal in *Friedman v. Board of County Comm'rs of Bernalillo*, 781 F.2d 777 (10th Cir.1985) (en banc), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986). In *Friedman*, the seal contained the Spanish motto "Con Esta Vencemos" ("With This We Conquer" or "With This We Overcome") over a Latin cross, highlighted by edging and rays of light. The cross is above mountains and a plain, with eight sheep standing on the plain. *Id.* at 779, 783 (appendix containing seal). Whether the sheep represented a Christian symbol or the county's sheep-raising industry was disputed. *Id.* at 779.

The cross was approximately half the length of the seal, making it, for example, approximately one foot tall when appearing on county vehicles. *Id.* at 779 & n. 1.[11] There was no record of either when the county adopted the seal or its purpose in doing so, but there was evidence that it was used intermittently in 1925, again in 1945 to 1956, and in 1973, when the county expanded the use of the seal by placing it on documents, stationery, motor vehicles, and sheriff's officers' uniforms. *Id.* at 779.

The Tenth Circuit concluded that the cross was not neutralized by its context, because the cross was "the only visual element on the seal [and] is surrounded by rays of light.... The motto may be fairly regarded as promoting the religion the cross represents. Indeed, that religion seems to be embraced as the instrument by which the county 'conquers.'" *Id.* at 782. As stated, we do not view our decision as conflicting with *Friedman*. Several distinguishing factors in the *Friedman* seal are readily apparent, most importantly: the lack of undisputed secular symbols within the seal; the accompanying phrase which translates "With This We Conquer"; the county's relatively recent expanded use of the seal; and that at least one county commissioner knew at that time that the cross represented the role of the Catholic Church in the settlement of the Southwest. *Id.* at 779.

Of interest is the reference to *Friedman* by Justice Kennedy in his concurrence and dissent in *County of Allegheny*:

> But coercion need not be a direct tax in aid of religion or a test oath. Symbolic recognition or accommodation of religious faith may violate the [Establishment] Clause in an extreme case. I doubt not, for example, that the Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall. This is not because government speech about religion is *per se* suspect, as the majority would have it, but because such an obtrusive year-round religious display would place the government's weight behind an obvious effort to proselytize on behalf of a particular religion. Cf. *Friedman v. Board of*

---

11. In contrast, the cross in Austin's insignia occupies a displacement area of only .4%–.12%.

*County Comm'rs of Bernalillo County,* 781 F.2d 777 (CA10 1985) (en banc) (Latin cross on official county seal); *American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098 (CA11 1983) (cross erected in public park); *Lowe v. Eugene,* 254 Or. 518, 463 P.2d 360 (1969) (same). . . .

492 U.S. at 661, 109 S.Ct. at 3137 (footnote omitted). But, needless to say, our case is not an extreme one. To the contrary, in considering the Establishment Clause challenge to Austin's insignia, we must recognize the reason for the cross originally being in the coat of arms; that Austin did not have an improper purpose in adopting the insignia; its long and unchallenged use; its non-proselytizing effect; that in its context, it does not endorse religion in any true or meaningful sense of the word "endorsement"; and that requiring the City to remove all displays of the insignia, arguably evinces not neutrality, but instead hostility, to religion.

In sum, we hold that the insignia passes constitutional muster, whether under *Lemon,* because its principal or primary effect is not one that either advances or inhibits religion, or under the Supreme Court's more recent pronouncements, including *Marsh, Lynch,* and *County of Allegheny.* In so holding, we obviously cannot fashion a bright line test to apply in future challenges to government use or depiction of religious symbols. Instead, as we must, we decide only the case before us. And in doing so, we have considered, and balanced, the totality of its unique facts and circumstances. In the oft-quoted words of Justice Goldberg, "the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow." *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 308, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring). Today, we glimpse only that mere shadow, one created by the sustaining, indeed ever-increasing, brilliance of the First Amendment.

III.

For the foregoing reasons, we VACATE the imposition of sanctions, and AFFIRM in all other respects.

APPENDIX 1

APPENDIX 2

S = SILVER
B = BLACK
G = GOLD

APPENDIX 3

APPENDIX 4

DUP.-FIND ORIGINAL PAGE

## City of Austin

Founded by Congress, Republic of Texas, 1839
Municipal Building, Eighth at Colorado, P.O. Box 1088, Austin, Texas 78767 Telephone 512/499-2000

---

GOLDBERG, Circuit Judge, dissenting:

They say hard cases make bad law—this is a hard case. The Austin insignia has existed without protest for the better part of this century. No one alleges that Austin is poised to establish a church of its own or that it is intentionally injecting religion into the mainstream of city life. But that some can glean no glaring harm from the inclusion of a Christian cross on the city's insignia makes its appearance there no less blinding on the constitutional spectrophotometer. The threat that lurks is no shadow. The Austin insignia presents as real a danger to the Establishment Clause as did the creche in *Allegheny*, the seals in *Harris* and *Friedman*, and the crosses in *St. Charles*, *Mendelson*, and *Rabun*. I respectfully dissent.

### I.

Anyone reading Establishment Clause precedent—the cases on non-purposeful, symbolic government support for religion—cannot help but be struck by the confusion that reigns in this area. The leading case, the Supreme Court's recent decision on creches, menorahs, and other Christmastime displays, *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), is a confusing matrix composed largely of minority opinions that reach contradictory results and focus on the minutiae of scenic design and physical arrangement. *See generally The Supreme Court—Leading Cases*, 103 Harv.L.Rev. 137, 228–39 (1989). Forthright commentators and jurists (Justice Kennedy and Judge Easterbrook come to mind) have justifiably criticized the arbitrary and inconsistent line-drawing sometimes required by *Allegheny* and other cases.

Nonetheless, it would be a mistake to suppose that all lines drawn in this area are equally arbitrary or that confusion is the order of the day whenever an Establishment Clause issue arises. On the contrary, areas of stable consensus have emerged. For example, judicial approval has been consistent for such secularized and time-worn practices as the coining of money with the phrase "In God We Trust" and the opening of legislative and judicial sessions with prayer or other invocations of the Deity. Although some argue that these practices are incompatible even with recent Establishment Clause jurisprudence, the margin of approval has remained quite wide.

Equally constant has been judicial disapproval of government use of Christian crosses and, independently, of religious imagery of any sort on municipal seals. No federal court has sustained government use of a cross in any context or any form of religious symbolism appearing on a municipal seal. The Supreme Court itself has repeatedly disapproved in dicta the governmental display of crosses, and at least three Justices have expressed apparent approval of one of the circuit cases, which held that a cross within the seal violated the Establishment Clause. *See Allegheny*, 109 S.Ct. at 3120 (O'Connor, J., joined by Brennan and Stevens, JJ., concurring in part and in the judgment) (citing *Friedman v. Board of County Commrs. of Bernalillo County*, 781 F.2d 777 (10th Cir.1985)).

The decisions in the cross and the seal cases have been founded on two observa-

tions. First, courts have repeatedly emphasized that the cross is and remains a religiously-charged symbol—indeed, not a symbol of religion generally, but of one particular sect. As the opinions elaborate, the cross is an emblem of Christianity's origins and history, possessing an emotional power of great dimension. Second, courts have recognized that a municipal seal quite literally puts the government imprimatur on whatever it touches and, by implication, whatever it includes in its design. As definitively as a trademark, a city's seal encapsulates its municipal identity, history, and authority; inescapably, it exudes endorsement and approval of the aspects of municipal life represented by its elements.

These two observations have been the basis for two unswerving lines of authority resulting in the disapproval or apparent abandonment of the challenged crosses or municipal seals. These lines have twice intersected in cases like the present one, in which the challenged object is a government seal containing a cross. In both cases, the Courts of Appeal have roundly condemned the challenged seals and enjoined their use. *Harris v. City of Zion*, 927 F.2d 1401 (7th Cir.1991); *Friedman v. Board of County Commrs. of Bernalillo County*, 781 F.2d 777 (10th Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986).

## II.

Among the requirements imposed by the Establishment Clause is that the "principal or primary effect [of a government action] must be one that neither advances nor inhibits religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (citation omitted). Adopting an approach first posited by Justice O'Connor, the Supreme Court has "refined"—or perhaps transformed—this requirement into a non-endorsement principle: the Establishment Clause "prohibits government from appearing to take a position on questions of religious belief or from making adherence to a religion relevant in any way to a person's standing in the political community." *Allegheny*, 109 S.Ct. at 3101; see also id. at 3119 (O'Connor, J., joined by Brennan and Stevens, JJ., concur-

ring in part and in the judgment); id. at 3124 (Brennan, J., joined by Marshall and Stevens, JJ., concurring in part and dissenting in part). This "prohibition against governmental endorsement of religion preclude[s] government from conveying ... a message that religion or a particular religious belief is favored or preferred." *Id.* at 3101 (internal quotations, citations, and emphasis omitted; brackets in original). Likewise, the government may not "promote" religion; "[w]hether the key word is 'endorsement,' 'favoritism' or 'promotion,' the essential principle remains the same." *Id.; see also Ball*, 473 U.S. at 390, 105 S.Ct. at 3226 (inquiry is "whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices."); *Larkin v. Grendel's Den*, 459 U.S. 116, 125–26, 103 S.Ct. 505, 511–12, 74 L.Ed.2d 297 (1982) (disapproving a statute that "provide[d] a significant symbolic benefit *to religion in the minds of some*").

Furthermore, the fact that government may not intend to promote religion does not legitimize the government's embracement of a religious activity; the constitutional evil is complete even when government merely *"appear[s]* to take a position on questions of religious belief," *Allegheny*, 109 S.Ct. at 3101 (emphasis added), or when it "makes[s] religion relevant, in reality *or public perception*, to status in the political community." *Id.* at 3119 (O'Connor, J., concurring in part and concurring in the judgment) (emphasis added); *see also Harris*, 927 F.2d at 1415 (similar, citing *Friedman*, 781 F.2d at 781). This is true "irrespective of government's actual purpose." *Lynch v. Donnelly*, 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). In short, a governmental practice is impermissible if it *"either* has the purpose *or* effect of endorsing religion." *Allegheny*, 109 S.Ct. at 3100 (emphasis added; internal quotations omitted).

Courts conduct the endorsement inquiry from the standpoint of a "reasonable ob-

server." *See Allegheny,* 109 S.Ct. at 3115 (Blackmun, J.), 3121 (O'Connor, J., joined by Brennan and Stevens, JJ., concurring in part and in the judgment), 3127 (Brennan, J., joined by Marshall and Stevens, JJ., concurring in part and dissenting in part); *see also The Supreme Court—Leading Cases,* 103 Harv.L.Rev. at 234 n. 44. The reasonable observer is one who is particularly sensitive to the message that the challenged symbol may convey to those who do not adhere to the religion associated with that symbol. As Justice Kennedy summarized the endorsement test, "the touchstone of an Establishment Clause violation is whether nonadherents would be made to feel like 'outsiders' by government recognition or accommodation of religion." *Allegheny,* 109 S.Ct. at 3142 (Kennedy, J., joined by Rehnquist, C.J., and White and Scalia, JJ., concurring in the judgment in part and dissenting in part); *see also id.,* 109 S.Ct. at 3119 (O'Connor, J., joined by Brennan and Stevens, JJ., concurring in part and concurring in the judgment) ("[T]he endorsement test captures the essential command of the Establishment Clause ... government cannot endorse the religious practices and beliefs of some citizens without sending a clear message to nonadherents that they are outsiders or less than full members of the political community.").

That the endorsement inquiry stresses the nonadherents' viewpoint is scarcely surprising. The first amendment prohibition against "law[s] respecting an establishment of religion" clearly benefits the minority, not those whose religions might otherwise receive government endorsement. Indeed, the Religion Clauses would have little purpose if interpreted principally from the standpoint of majorities already well-protected by the political process. Majoritarian adherents, construing a government action devoid of religious purpose, may not perceive the endorsement message that the minority receives with stinging clarity. Only through sensitivity to the nonadherent can we effect the constitutional values inherent in the Religion Clauses. *Cf. Ellison v. Brady,* 924 F.2d 872, 878–80 (9th Cir.1991) (adopting perspective of "reasonable woman" in order to effect statu-

tory aim of sex discrimination statute). Yet, by insisting that the test be an objective one—a "reasonable nonadherent" test—the endorsement inquiry retains the ability to discount the perceptions of a hypersensitive plaintiff.

By including a Latin cross in its insignia, the City of Austin has conveyed to the reasonable nonadherent, albeit unintentionally, that it endorses the Christian faith. A fact-intensive scrutiny of the nature of the challenged symbol and the context in which it appears proves this point. *See Allegheny,* 109 S.Ct. at 3103; *Harris,* 927 F.2d at 1412 & n. 11; 103 Harv.L.Rev. at 230.

### A.

The cross is the paradigmatically Christian symbol—"the principal and unmistakable symbol of Christianity as practiced in this country today," *Harris,* 927 F.2d at 1403 (citing *St. Charles,* 794 F.2d at 267 (Posner, J.))—as recognizably emblematic of that creed's two-thousand year history as the flag is of our "two hundred years of nationhood." *Smith v. Goguen,* 415 U.S. 566, 603, 94 S.Ct. 1242, 1262, 39 L.Ed.2d 605 (1974) (Rehnquist, J., dissenting); *see also Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 2548, 2552, 105 L.Ed.2d 342 (1989) (Rehnquist, J., dissenting) (flag burning case). It symbolizes a singular event in the origin of the Christian faith, the Crucifixion and Resurrection of Christ, as surely as Old Glory, with its thirteen stripes, symbolizes the founding of our nation. The Supreme Court has described the Christian cross in terms that leave no doubt as to its power:

> Symbolism is a primitive but effective way of conveying ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or banner, a color or design. The State announces rank, function, and authority through crowns and maces, uniforms and black robes; the church speaks through the Cross, the Crucifix, the altar and

shrine, and clerical raiment. Symbols of State often convey political ideas just as religious symbols come to convey theological ones.

*West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 632, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943), *quoted in part in Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989); *see also Greater Houston Chapter of ACLU v. Eckels,* 589 F.Supp. 222, 234 (S.D.Tex.1984) (cross is "primary symbol[ ] for Christianity"), *appeal dismissed,* 755 F.2d 426 (5th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); *Hewitt v. Joyner,* 705 F.Supp. 1443, 1449 (C.D.Cal.1989) ("preeminent symbol"), *judgment reversed,* 940 F.2d 1561, 1568 (9th Cir.1991) (holding that park display of immovable statuary depicting scenes from the New Testament violated the California constitution's establishment clause provision).

As inspirational a symbol as the cross may be to Christians, its effect on non-Christians is likely to be quite different. As the Supreme Court observed with regard to symbols generally, "what is one [person]'s comfort and inspiration is another's jest and scorn." *Barnette,* 319 U.S. at 633, 63 S.Ct. at 1183. A cross may, at the very least, "stand[ ] as a dramatic reminder [to nonbelievers] of their differences with Christian faith." *Lynch,* 465 U.S. at 708 & n. 14, 104 S.Ct. at 1377 & n. 14 (Brennan, J., dissenting). Indeed, "[t]he effect on minority religious groups, as well as on those who may reject all religion, is to convey the message that their views are not worthy of public recognition nor entitled to public support." *Id.* at 701, 104 S.Ct. at 1374 (Brennan, J., dissenting) (footnote omitted). More grimly, the Tenth Circuit has explained that the cross carries with it a strong message, for it has

> at times symbolized outright oppression and persecution of Jewish people. It cannot be denied ... that the cross probably would have a similarly threatening connotation for a Lebanese Moslem or Northern Irish Protestant. We are compelled to draw the same conclusion with regard to the reactions of Native Americans.... The seal certainly does not memorialize their "Christian heritage" but rather that of those who sought to extinguish their culture and religion.

*Friedman,* 781 F.2d at 781–82. The Seventh Circuit has reminded us that

> The crosses burned by the Klu Klux Klan are Latin crosses; and the burning cross, symbol of bigotry that it is, continues to remind of the Christian symbol that the Klan has appropriated to its sinister purposes. The ... cross unmistakably signifies Christianity, as the reindeer and Santa Claus, and even the star and the wreath, do not.

*ACLU v. City of St. Charles,* 794 F.2d 265, 273 (7th Cir.1986).

One would be hard-pressed to reconcile so religiously-fraught a symbol with the Establishment Clause, and, apparently, no federal case has done so. Whether planted on mountains, lit up on broadcasting antennas, erected at memorial sites and city parks, painted on water towers, affixed to government buildings, or, indeed, displayed on municipal seals, state-sponsored crosses—even where barely recognizable as such—have fallen in the wake of federal court challenges. *See e.g., Harris,* 927 F.2d at 1414–15 (striking down seal); *Friedman,* 781 F.2d at 781–82 (same); *St. Charles,* 794 F.2d at 273 (enjoining display of cross on city building) (collecting cases); *Mendelson v. City of St. Cloud,* 719 F.Supp. 1065, 1069 (M.D.Fla.1989) (holding that permanent display of cross on city water tower was unconstitutional: "no federal case has ever found the display of a Latin cross on public land by a state or state subdivision to be constitutional") (collecting cases); *Jewish War Veterans of United States v. United States,* 695 F.Supp. 3, 11–15 (D.D.C.1988) (holding that cross could not be used as memorial to servicemen missing in action) (collecting cases); *ACLU of Georgia v. Rabun County,* 698 F.2d 1098, 1110 n. 23 (11th Cir.1983) (upholding district court's ruling that display of cross in state park violated each prong of *Lemon* test) (collecting cases). *But cf. St. Charles,* 794 F.2d at 274 (collecting *state* cases allowing crosses to be

displayed in contexts other than a city seal); *Rabun,* 698 F.2d at 1110 n. 23 (same).

Even the Supreme Court, in dicta, has spoken with a single, disapproving voice on this issue. *See Allegheny,* 109 S.Ct. at 3104 (Blackmun, J.) (majority opinion), 3120 (O'Connor, J., joined by Brennan and Stevens, JJ.) (citing *Friedman* with apparent approval), 3126 n. * (Brennan, J., joined by Marshall and Stevens, JJ.) (display of cross next to an Easter bunny used as example of display unlikely to "comport with Justice O'Connor's views"), 3132 (Stevens, J., joined by Brennan and Marshall, JJ.), 3137 (Kennedy, J., joined by Rehnquist, C.J. and White and Scalia, JJ.); *Lynch,* 465 U.S. at 695 & n. 1, 104 S.Ct. at 1370 & n. 1 (Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ.), at 701 n. 7, 104 S.Ct. at 1374 n. 7 (citing with approval California case disallowing erection of cross in front of city hall).

Several years ago, in a decision we let stand on procedural grounds, one of our own district courts ordered the removal of "three Latin-style crosses and a Star of David" from a county veterans' memorial. *Greater Houston Chapter of ACLU v. Eckels,* 589 F.Supp. 222, 241 (S.D.Tex.1984) (decided on grounds of both religious purpose and effect), *appeal dismissed,* 755 F.2d 426 (5th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985). Most recently, the Seventh Circuit enjoined the use of a city seal containing a barely-distinguishable cross. *Harris,* 927 F.2d 1401. Were he to reach the merits, even the panel's dissenter, Judge Easterbrook, would have "condemn[ed]" the seal. *Harris,* 927 F.2d at 1425 (Easterbrook, J., dissenting on other grounds) (condemning seal even though "[t]he object of everyone's attention looks more like a telephone pole than a cross; its arms are too short to crucify anyone."). The cases are unambiguous: a cross displayed by the government is too emphatically sectarian a symbol to survive Establishment Clause scrutiny.

## B.

The context in which the cross appears in this case makes matters only worse. Con-

text encompasses three distinct aspects of the cross's presentation: its setting, its arrangement in relation to other elements in the setting, and its temporal "location" and duration. *Allegheny,* 109 S.Ct. at 3103–04.

The setting of this cross is, of course, the city insignia. Just as a cross is emblematic of the Christian religion, so too, the city insignia is emblematic of the City of Austin. The evidence establishes that the Austin insignia is pervasive; it appears on letterhead, utility bills, uniforms, vehicles, buildings, at outdoor sites and in the chambers of the City's representative government. Wherever the City wants its mark, the insignia is the mark it makes. The insignia, although lacking the transcendent power of a cross or national flag, is nonetheless the city's trademark, the symbol of its corporate existence, historical roots, and municipal authority. Austin's insignia "acts as the City's imprimatur for official correspondence, property and business." *See Harris,* 927 F.2d at 1412.

With this background, it is not surprising that every federal challenge to religious imagery of any sort on a city insignia has succeeded. Whether the religious element is a cross, a temple, or a word or phrase, its presence on a municipal insignia has been followed by its removal. As the *Harris* court explained:

> [T]he obvious presence of a Latin cross on the corporate seal of [a city] ... endorses or promotes a particular religious faith. It expresses an unambiguous choice in favor of Christianity. It presents to any observer a clear endorsement of all those beliefs associated with a Latin cross in violation of the Establishment Clause of the first amendment.

> Like the seat of county government in *County of Allegheny,* or the City Hall Building in *American Jewish Congress [v. City of Chicago,* 827 F.2d 120 (7th Cir.1987) ], the corporate seal of a municipality is "plainly under government control ... (and is) a clear symbol of government power." ... The Latin cross on the seal, then, brings together church and state in a manner that suggests their

alliance perhaps even more ardently than the unconstitutional creche displays in *County of Allegheny* or *American Jewish Congress....* The conspicuous depiction of the pre-eminent symbol of a particular faith on that seal conveys a message of approval that is simply inconsistent with the first amendment.

*Harris*, 927 F.2d at 1412. Like the creche invalidated in *Allegheny*, "[n]o viewer could reasonably think" that the cross occupies so ·central a location on the seal "without the support and approval of the government." *Allegheny*, 109 S.Ct. at 3104 (majority opinion).

The second element of context is what might be called "arrangement," meaning· the placement and effect of the elements of the challenged display. Two principles have emerged from recent cases. The first is that neutral objects surrounding a religious symbol may have the effect of "framing" the symbol, making it more visible and its religious message more prominent. Thus, "[t]he floral decoration surrounding the [*Allegheny*] creche ... [is a] frame ... [which] serves only to draw one's attention to the message inside the frame"; it "contributes to, rather than detracts from, the endorsement of religion conveyed by the creche." *Id.*

The cross on Austin's insignia is framed by objects that serve to "draw one's attention to the message inside the frame." *Allegheny*, 109 S.Ct. at 3104 (majority opinion). Most literally, the cross is framed by a pair of wings. Equally effective is the arrangement of the light stripe and the lamp of knowledge, which draw the viewer's attention to the cross. The insignia's contrasting colors have a similar effect.

The second principle emerging from the Supreme Court analysis of physical arrangement is that, in holiday displays, the *nonreligious* meaning of a religious object may be enhanced by the placement of other objects appropriate to the season, at least so long as such objects have their "own focal point[s]" and "specific visual stor[ies] to tell." *Allegheny*, 109 S.Ct. at 3104. Thus, explained the Court, the Santa Claus and "talking wishing well" in *Lynch* ren-

dered a creche acceptable by tying it to the secular aspects of the Christmas season. *Id.* at 3103–04; *see also id.* at 3112. This secularizing effect, which might ameliorate what would otherwise be a constitutional violation, does not occur in the Austin insignia. True, the insignia does include other symbolic elements, specifically the capitol building and the lamp. But these elements relate to no holiday and share no meaning in common with the cross other than their representation of institutions within the city. Under *Allegheny*, such mere coexistence is inadequate to secularize the cross. *Id.* at 3103–04.

Nor is the cross's message muted by its presence in a secular venue, the insignia. itself. *See Harris*, 927 F.2d at 1425 (Easterbrook, J., dissenting on other grounds) ("Governance is not a 'context' that drains the significance of a religious image.") (discussing presence of cross and secular elements on city seal); *see also Eckels*, 589 F.Supp. at 235 (message conveyed by cross is "purely religious" and is "not lost when [it is] removed from the churches ... with which it is traditionally associated"). In this respect, a city insignia is quite unlike, for example, a county art museum, whose essential nature as a neutral showplace does tend to negate a message of endorsement of any religious paintings displayed there. *See Lynch*, 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring) (describing how museum context negates endorsement message); *Hewitt v. Joyner*, 940 F.2d 1561, 1568 (9th Cir.1991) (same). A municipal insignia, unlike a municipal museum, is neither intended nor understood as a neutral presentation of diverse images for the viewer's edification and amusement, any more than Old Glory serves as a trifling display of stripes and stars.

The lamp and capitol building, far from secularizing the cross, actually *enhance* the impact of its religious message. Like the Rolling Meadows seal rejected in *Harris*, Austin's insignia is no mere catalog of "neutral snapshots of the community"; rather, the images on the insignia "are charged with endorsement." *Harris*, 927

F.2d at 1412. Who could sensibly assume that the City's leaders have a neutral attitude towards the presence of the state capitol, or that they are indifferent to "the educational advantages of the city?" Its insignia contains a Christian cross superimposed over a silhouette of the state capitol building and placed above a lamp representing Austin's schools and universities, the two most significant institutions in the City. The lamp and capitol epitomize the City's municipal identity; the glow of governmental endorsement with which they are surrounded bathes the cross as well. To any reasonable observer, Austin's insignia "expresses the City's approval of those [three] pictures of City life— ... its schools," its role in state governance, "and its Christianity." *Harris*, 927 F.2d at 1412.

The final element of context is temporal: when does the government display occur and for how long? In the case of the *Allegheny* Christmas tree and menorah, one factor contributing to the acceptability of the display was its appropriateness to the holiday season—a "location" in time that tended to secularize the display's elements, because the holiday season to which they were tied was recognized as having both secular and spiritual aspects. The caselaw also hints that the short duration of such seasonal displays is to their benefit. *See, e.g., Eckels*, 589 F.Supp. at 235 (alluding to the "temporary governmental celebration of a religious holiday that has acquired some secular flavor"). In any event, the Austin city insignia can claim the benefit of neither of these factors; it is the emblem of no holiday and is a permanent fixture on the city's insignia.

### III.

A cross need not be erected on a mountaintop to become worthy of judicial scrutiny. Though small, the cross in Austin's insignia is clearly visible even in the black-and-white reproduction appearing in the law books, not to mention the clarity it may take on when rendered in contrasting colors. Even at a distance of four feet, the cross in the reproduction remains recognizable for what it is, a Christian cross. The same cannot be said for the cross on the seal recently disapproved by the Seventh Circuit, which resembled—at any distance—nothing so much as a telephone pole in front of a factory. *Harris*, 927 F.2d at 1419 (Easterbrook, J., dissenting). I am therefore unpersuaded by the majority's effort to distinguish *Harris* on the ground that "the Rolling Meadows' seal arguably conveys a message of its being a 'Christian community'" whereas Austin's insignia purportedly does not. *See* majority op. at page 157. I am similarly unimpressed by the fact that the cross occupies only a small percentage of the insignia's surface area in its various versions. *See* majority op. at page 157 n. 11 (cross in Austin's insignia occupies a displacement area 0.12% to 0.4%). The constitutional significance of the cross's presence in the Austin insignia cannot be reduced to some geometrical equation. Measuring a cross in terms of "displacement area" understates the cross's visual impact since the essentially linear nature of a cross gives it a relatively small surface area. Though I claim no modicum of expertise in mathematics, I would suppose that even a cross mounted atop city hall, for example, would occupy a similarly negligible percentage of the surface area of the facade of that building. But surely no court would find that display constitutional.[1] *See St. Charles*, 794 F.2d at 273 (upholding preliminary injunction prohibiting display of cross atop a firehouse during Christmas season).

The cross is not a "passive" symbol of a holiday season, as some have characterized a creche, menorah, and Christmas tree. *See Allegheny*, 109 S.Ct. at 3139 (Kennedy, J., dissenting). Nor does it bear any resemblance to legislative prayer, "In God We Trust," "God save this honorable Court," and other ritual invocations approved by the Supreme Court. The Court's

---

1. I suppose that if we were forced to resort to a mathematical formula to resolve this case, I would suggest that we compare the height of the cross in relation to the diameter of the insignia; this ratio, in one version of the seal, is 1 to 8, or 12.5%. I would submit that such a ratio is far more telling of the visual impact of the seal than a measure of displacement area.

approval stems from its conclusion that these instances of reflexive theism are non-sectarian, have largely lost their religious nature over time, and, in some cases at least, serve the secular function of solemnifying public occasions. *See Allegheny*, 109 S.Ct. at 3120–21; *Lynch*, 465 U.S. at 693, 104 S.Ct. at 1369; *see also Jones v. City of Clear Creek*, 930 F.2d 416, 421–22 (5th Cir.1991) (upholding constitutionality of nonsectarian invocations and benedictions at high school graduation ceremony); 103 Harv.L.Rev. at 237. Whatever one may think of this reasoning, the exception is quite narrow; change the inscription on our coinage to "Jesus Saves," "Allah Be Praised," or "Sha'ma Yisroel," and no exception will avert an injunction. Minting a seal with a cross yields no greater seigniorage. The Christian cross has retained its religious nature for two thousand years and serves no secular function on the insignia. *See St. Charles*, 794 F.2d at 271 (Posner, J.) ("the Latin cross has not lost its Christian identity"). The exception is simply inapplicable.[2]

Although the majority "view[s] any perceived preference by use of the insignia to be even more remote than" the display of holiday symbols or the invocation of legislative prayer, majority op. at page 155 (referring to *Lynch, Allegheny,* and *Marsh* ), the majority fails to identify a secular facet to the cross. There is none. Displayed prominently in the context of a city's insignia, it conveys an unmistakable message of religious—indeed sectarian—endorsement.

### IV.

A little accommodation is a dangerous thing—the floodwaters may not be far behind. We cannot discount this case as implicating nothing more than a trivial display, because in doing so, we establish a precarious precedent in the First Amendment forum. Religious symbols, when widely recognized as such, have no place in a city's emblem.

I agree with Judge Easterbrook when he says that "we ought to use bright line rules" in this very sensitive area of constitutional jurisprudence and "condemn the use of any religious imagery not nestled in a secular context." *Harris*, 927 F.2d at 1425 (Easterbrook, J., dissenting). Otherwise, we judges will be immersed in the minutiae of graphic design, our rulers and calipers in hand, scrutinizing each symbol for acceptable proportion, color, and gloss. With no principled basis for distinguishing one seal from the next, our opinions will be fastidiously fact-bound and our precedent hopelessly abstract.

I fear that the majority takes the first wobbly step in that direction. The road they will travel is no Appian Way. I would rather that we steer away from that course and follow the path of our sister circuits instead. Not prepared to join my colleagues on their perilous journey, I respectfully dissent.

---

**2.** *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), relied upon heavily by the majority, is no saving grace. It must be read for what it is: a very narrow opinion on the singular issue of legislative prayer in the context of its "unique history." Any effort to extend *Marsh* beyond the particular facts of that case is a reach, and not surprisingly, *Marsh* has been distinguished and construed narrowly by those courts confronting even factually similar cases. *See, e.g., North Carolina Civil Liberties Union Legal Foundation v. Constangy,* 947 F.2d 1145 (4th Cir.1991) (upholding injunction against state judge prohibiting him from opening his courtroom proceedings with a prayer).